IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 24, 2017 Session Heard at Cookeville[1]

FILED
01/09/2018
Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. LAJUAN HARBISON

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 101406      Steven Wayne Sword, Judge**

_____

### No. E2015-00700-SC-R11-CD

_____


A jury convicted LaJuan Harbison of four counts of attempted voluntary manslaughter and four counts of employing a firearm during the commission of a dangerous felony. The Court of Criminal Appeals reversed the convictions and remanded for a new trial, holding that the trial court erred in denying Harbison's request for a separate trial, that his multiple convictions for employing a firearm during the commission of a dangerous felony violated the prohibition against double jeopardy, and that the evidence was insufficient to support one of the counts of attempted voluntary manslaughter and employment of a firearm during the commission of a dangerous felony. We granted the State's application for permission to appeal to determine whether the trial court properly exercised its discretion by denying Harbison's motion for severance; whether Harbison waived the double jeopardy issue; and if not, whether Harbison's convictions for employing a firearm during the commission of a dangerous felony violate the prohibition against double jeopardy where he used one firearm but was convicted of multiple dangerous felonies against different victims. We hold that the trial court did not abuse its discretion in denying Harbison's request for a separate trial; Harbison did not waive the double jeopardy issue; and his multiple convictions for employment of a firearm during the commission of a dangerous felony do not violate the prohibition against double jeopardy. We reverse the judgment of the Court of Criminal Appeals, reinstate Harbison's three convictions for attempted voluntary manslaughter and three convictions for employment of a firearm during the commission of a dangerous felony, and remand to the trial court for resentencing and corrected judgments.

_____

[1] Oral argument was heard on the campus of Tennessee Technological University in Cookeville, Tennessee, as part of the Tennessee American Legion Boys State S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
Court of Criminal Appeals Reversed; Case Remanded to the Trial Court**

SHARON G. LEE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Nicholas W. Spangler, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha M. Fitzgerald and Philip H. Morton, Assistant District Attorneys General, for the appellant, State of Tennessee.

Gerald L. Gulley, Jr. (on appeal) and A. Philip Lomonaco (at trial), Knoxville, Tennessee, for the appellee, LaJuan Harbison.

**OPINION**

**I.**

A Knox County grand jury indicted LaJuan Harbison on four counts of attempted first-degree murder and four counts of employing a firearm during the commission of a dangerous felony. These charges arose out of a shooting on September 7, 2012, near Austin-East High School in Knoxville. In the same indictment, the grand jury charged Arterious North with four counts of attempted first-degree murder and four counts of employing a firearm during the commission of a dangerous felony; and Laquinton Brown and Carlos Campbell with three counts of attempted first-degree murder, three counts of employing a firearm during the commission of a dangerous felony, two counts of attempted especially aggravated robbery, and two counts of attempted aggravated robbery. Before trial, the State dismissed one count of attempted first-degree murder and one count of employing a firearm during the commission of a dangerous felony against Brown and Campbell.

Harbison and his co-defendants were tried by a jury on January 27, 28, 30, 31, and February 1, 2014. The State's proof showed that on September 7, 2012, around 4:30 p.m., Campbell was driving a vehicle on Martin Luther King Jr. Avenue near Austin-East High School with Brown in the front passenger's seat and M.W.[2] and another person in the back seat. Around this same time, Harbison was driving a vehicle in the opposite

_____

[2] We refer to minors by their initials rather than their full names.

direction on Martin Luther King Jr. Avenue toward Austin-East High School with North in the front passenger's seat and Montiere King and "Little Paul" in the back seat.

At this same time, a group of students, including L.P. and Q.T., was standing on a sidewalk near Austin-East High School. As Campbell drove by, L.P. saw four people including M.W. in the vehicle. Q.T. signaled to the vehicle because he thought he saw his brother in the back seat. After driving past the students a couple of times, Campbell stopped the vehicle, and Brown got out of the front passenger's seat and approached L.P. and Q.T. to speak with them. Brown, with the handle of a gun sticking out of his waistband, asked L.P. and Q.T. which one of them had thrown up a gang sign. Q.T. responded that "[w]e don't bang." Brown directed them to empty their pockets. As Q.T. pulled out his pockets, L.P. saw an approaching vehicle (Harbison's vehicle) stop and its occupants start shooting. At that point, Brown pulled out his gun and fired it. Q.T. said he heard shots coming from somewhere behind Brown and saw Brown pull out his gun, start shooting, and run away. L.P. and Q.T. tried to flee, but a bullet, consistent with one fired from a gun used by a passenger in Harbison's vehicle, struck and seriously wounded L.P. In a subsequent police lineup and at trial, L.P. identified Brown as the man who got out of Campbell's vehicle and fired a gun.

Malika Guthrie, a teacher at Austin-East High School and Vine Middle School, was driving her vehicle behind Campbell. She saw Campbell's vehicle stop, for no apparent reason, in the middle of Martin Luther King Jr. Avenue. A passenger, later identified as Brown, jumped out and approached L.P. and Q.T. in an aggressive, confrontational manner. Guthrie saw L.P. and Q.T. pulling their pockets out and holding up their hands indicating they had nothing. She believed Brown was robbing L.P. and Q.T. As Brown turned back to the Campbell vehicle, Guthrie heard shots being fired. Guthrie's daughter, a passenger in her mother's vehicle, also saw Brown confronting L.P. and Q.T. and observed another vehicle approach. She heard gunshots, saw the occupants of Campbell's vehicle shoot back, and then observed both vehicles drive away.

The driver of a Knoxville Area Transit bus behind the Guthrie vehicle saw Brown get out of the Campbell vehicle and direct L.P. and Q.T. to empty their pockets. Like Guthrie, she thought Brown was robbing them. After they pulled out their pockets, she saw Brown turn back to the vehicle, get a gun, and start firing it.

S.W. was with her cousin, L.P., and Q.T. on the sidewalk just before the shooting. She saw the Campbell vehicle, with M.W. in the back seat, drive by a few times with loud music playing. On the vehicle's second pass, she saw the occupants of the vehicle, including Brown, hanging out of the window making gang signs, and L.P. and Q.T. responding with hand signs. The third time the vehicle came by, it stopped, and Brown

got out and "tried to rob" L.P. and Q.T. She saw Brown step back, pull a gun, and start shooting. She also saw a backseat passenger in Campbell's car get out and start shooting.

Following the shooting, Knoxville City Police Department officers interviewed Harbison, North, Brown, and Campbell. Harbison initially denied any involvement in the September 7 shooting but later in the interview admitted he drove his vehicle and shot a gun during the episode. Harbison told police he got rid of the gun after the shooting. North admitted he was the front seat passenger in Harbison's vehicle and shot a .357 caliber gun. According to North, Harbison used a "little nine," one of the backseat passengers (King or "Little Paul") had a Glock handgun, and the other one had a Hi-Point handgun. Campbell admitted he drove the other vehicle and that Brown was in the front passenger's seat and M.W. in the back seat. Campbell claimed that after stopping his vehicle near a group of students, another vehicle pulled up beside him, and shots were fired from that vehicle. Brown said that after L.P. and Q.T. made gang signs at them, Campbell stopped so Brown could get out and talk to L.P. and Q.T. After the Harbison vehicle arrived on the scene and its occupants began firing, Brown hit the ground. He denied having a gun or firing a gun during the September 7 shooting.

Based on evidence found at the crime scene and in Harbison's and Campbell's vehicles, a Knoxville Police Department firearms examiner determined that multiple guns were fired from both vehicles. Police investigators observed that both vehicles had numerous exterior defects consistent with bullet holes, but it was not known how many of the bullet holes predated the September 7 shooting. At the crime scene on Martin Luther King Jr. Avenue, police found bullet fragments and two .38 caliber shell casings and a .45 caliber shell casing. In Campbell's vehicle, investigators found a bullet fragment under the right front passenger's floor mat, a fired bullet core in the right rear passenger's door, a bullet jacket from a .38, .357, or 9-millimeter firearm under the driver's front mat, and a fired .45 caliber bullet in the left rear passenger's seat. The fired .45 caliber bullet found in the left rear passenger's seat was similar to the .45 caliber bullet removed from L.P. at the hospital. These bullets were consistent with a bullet fired from a Hi-Point semi-automatic revolver, which North told police was used by one of the backseat passengers in Harbison's vehicle.

A search of Harbison's vehicle revealed wallets in the glove compartment belonging to Harbison and King. Investigators also found a fired bullet in the driver's floorboard and a 9-millimeter shell casing on the floorboard behind the front passenger's seat.

After the State rested, the trial court granted Campbell's and Brown's motions for acquittal on two counts of attempted especially aggravated robbery and attempted

aggravated robbery and reduced the remaining two robbery counts to two counts of aggravated assault.[3]

Harbison and Brown each testified in his own defense. Harbison, eighteen years old at the time of the offense, previously attended Austin-East High School. He knew Q.T. from when Harbison taught drums to Vine Middle School students. Harbison knew L.P. through his sister who had gone to Austin-East High School with Harbison. On the day of the shooting, Harbison was carrying a 9-millimeter handgun because he feared Campbell and Brown, whom he suspected of being involved in an incident at Harbison's mother's house. Just before the shooting started, Harbison stopped his vehicle near Austin-East High School after seeing an approaching school bus in the opposite lane extend its stop sign. Harbison then saw Brown get out of Campbell's vehicle and approach L.P. and Q.T. Harbison recognized Brown and Campbell and was surprised to see them in that part of Knoxville. When Harbison saw L.P. and Q.T. hold up their hands, Harbison believed Brown was robbing them. As Brown stepped back towards Campbell's vehicle, Harbison saw Brown draw a handgun and fire a shot. Harbison pulled his gun and fired it twice into the air. Harbison claimed he fired his gun only to protect L.P. and Q.T. and to prevent Brown from robbing them. He said he did not intend to harm anyone. After Harbison fired into the air, he heard "shots coming up out of – from everywhere." Harbison, North, King and "Little Paul" began firing their weapons. As Harbison drove away, he continued to hear gunfire coming from behind him.

According to Brown, on the afternoon of September 7, he was riding in the front seat of Campbell's vehicle. As the vehicle passed a group of students standing near Austin-East High School, Brown saw Q.T. signal to him. Campbell stopped the vehicle so that Brown could get out and talk to L.P. and Q.T. After a brief conversation, Brown realized that he did not know them and went into "safety mode." He directed Q.T. and L.P. to empty their pockets to see if they were armed. As Brown was backing away toward Campbell's vehicle, Brown heard a gunshot. He fell to the ground and heard more shots, although he could not determine their source. Campbell's vehicle left, and Brown ran away. Brown denied attempting to rob L.P. and Q.T. or having a gun that day. Brown also denied that he had ever previously possessed a weapon. Brown had no recollection of a video of him and his cousin, Cuben Lagrone, riding around while brandishing

---

[3] Specifically, the trial court granted Campbell's and Brown's motions for acquittal on one charge of attempted especially aggravated robbery of L.P. (by violence) and one charge of attempted aggravated robbery of Q.T. (by violence). The trial court partially granted Campbell's and Brown's motions for acquittal on one charge of attempted especially aggravated robbery of L.P. (by putting in fear) and one charge of attempted aggravated robbery of Q.T. (by violence) and reduced the charges to two counts of aggravated assault. The basis for the trial court's action was the lack of proof that Brown intended to take anything from L.P. or Q.T.

weapons. To refresh his recollection, the State played Brown the video, but Brown claimed he did not recognize the voices or the faces. On rebuttal, a Knoxville Police Department officer explained that he had obtained Lagrone's cell phone while investigating an August 2012 shooting at Harbison's mother's house. The cell phone contained multiple videos of Lagrone and Brown, including the one shown to Brown. The officer identified Lagrone and Brown in the video, which showed the men driving around Knoxville at night and listening to music. Lagrone was holding a Smith and Wesson handgun, while Brown brandished a firearm with an extended magazine. One man can be heard saying, "[expletive deleted] the police." After passing multiple police cars, one man says, "there go the boys. Get ready."

The jury found Harbison guilty of four counts of the attempted voluntary manslaughter of L.P., Brown, Campbell, and M.W. and four counts of employing a firearm during the commission of a dangerous felony. The jury convicted North of four counts of the attempted voluntary manslaughter of L.P., Brown, Campbell, and M.W. and four counts of employing a firearm during the commission of a dangerous felony; convicted Brown of two counts of the attempted voluntary manslaughter of Harbison and North, two counts of employing a firearm during the commission of a dangerous felony, and two counts of aggravated assault of L.P. and Q.T.; and convicted Campbell of two counts of aggravated assault of L.P. and Q.T. and acquitted him of remaining charges. The trial court sentenced Harbison to an effective sentence of twenty-two years.[4]

Harbison's amended motions for new trial challenged the denial of his motion for severance; the sufficiency of the evidence, which included a challenge to the multiple convictions for employing a firearm during the commission of a dangerous felony; and the excessiveness of his sentence. The trial court denied Harbison's motions for new trial.

Harbison appealed.[5] The Court of Criminal Appeals reversed and remanded for a new trial, finding that the trial court erred in denying the motion for severance; that the convictions for employing a firearm during the commission of a dangerous felony

---

[4] The trial court sentenced North to twenty-two years, Brown to twenty-two years, and Campbell to six years.

[5] The Court of Criminal Appeals reversed North's convictions for the attempted voluntary manslaughter of L.P. and for employing a firearm during the commission of a dangerous felony and affirmed the remaining convictions. *State v. North*, No. E2015-00957-CCA-R3-CD, 2016 WL 6248598, at *1, *17–20 (Tenn. Crim. App. Oct. 26, 2016), *perm. app. filed* (Dec. 23, 2016). The Court of Criminal Appeals affirmed the convictions of Brown and Campbell. *State v. Brown*, No. E2015-00899-CCA-R3-CD, 2016 WL 3633474, at *1 (Tenn. Crim. App. June 29, 2016), *perm. app. denied* (Oct. 20, 2016); *State v. Campbell*, No. E2015-00730-CCA-R3-CD, 2016 WL 829742, at *1 (Tenn. Crim. App. Mar. 3, 2016).

violated the prohibition against double jeopardy; that the evidence was insufficient to support his conviction for the attempted voluntary manslaughter of L.P. and the accompanying firearm conviction; and that the trial court did not err in determining Harbison's sentence. *State v. Harbison*, No. E2015-00700-CCA-R3-CD, 2016 WL 4414723, at *31 (Tenn. Crim. App. Aug. 18, 2016).

We granted the State's application for permission to appeal.[6] The issues we address are:

(1)    Whether the trial court abused its discretion by denying Harbison's motion for severance.

(2)    Whether Harbison properly raised a double jeopardy issue in the trial court and the Court of Criminal Appeals or whether he waived the issue.

(3)    If Harbison did not waive the double jeopardy issue, whether his four convictions for employing a firearm during the commission of a dangerous felony violate the prohibition against double jeopardy when he used one firearm but there were four distinct underlying felonies and four victims.

## II.

*Denial of Motion for Severance*

The State argues that the trial court properly exercised its discretion in denying Harbison's request for a separate trial under Rule 14 of the Tennessee Rules of Criminal Procedure and that he failed to establish clear prejudice from this ruling. Harbison contends that the Court of Criminal Appeals properly concluded that the trial court erred in denying his motion for severance and that he was clearly prejudiced by the ruling. In particular, Harbison asserts that the evidence established "overt hostility" among the co-defendants, hostility from courtroom spectators, mutually antagonistic defenses among the co-defendants, and Harbison's limited control over his defense. Similarly, Harbison claims the jury heard "lurid testimony and videos about guns, unindicted bad actors, and other crimes" unrelated and irrelevant to the charges against him. Next, Harbison contends that the trial court's decision at the close of the State's proof to

---

[6] The State did not appeal the Court of Criminal Appeals' reversal of the conviction for the attempted voluntary manslaughter of L.P. and the accompanying firearm conviction.

dismiss two of the robbery charges and reduce the two remaining robbery charges against Brown and Campbell to two charges of aggravated assault undercut Harbison's defense that he acted to protect Q.T. and L.P. from Brown. Finally, Harbison submits that the evidence regarding multiple offenses and multiple co-defendants impaired the jury's ability to make an individualized determination about each co-defendant.

Joint trials of defendants charged in the same indictment are favored because they promote efficiency and reduce the possibility of inconsistent verdicts. *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). Tennessee Rule of Criminal Procedure 8 provides that two or more defendants may be charged in a single indictment under these circumstances: if each defendant is charged with accountability for each offense; if each defendant is charged with conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy; or, when conspiracy is not charged and all of the defendants are not charged in each count, if the offenses charged "were part of a common scheme or plan" or "were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." Tenn. R. Crim. P. 8(c). This rule promotes economy and efficiency by encouraging a single trial for offenses arising out of a single criminal episode. Tenn. R. Crim. P. 8 advisory committee cmt.

A defendant may seek a severance under Tennessee Rule of Criminal Procedure 14(c)(2), which requires a trial court to grant the request if severance is found to be "appropriate to promote a fair determination of guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2).[7] There is no bright-line rule as to when a trial court should grant a defendant's request for severance. Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance: the number of defendants named in the indictment, the number of counts charged in the indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a co-defendant(s) which is inadmissible or excluded as to another defendant. *See United States v. Gallo*, 668 F. Supp. 736, 749 (E.D.N.Y. 1987).

---

[7] A defendant may also "move[] for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant . . . ." Tenn. R. Crim. P. 14(c)(1). As the Court of Criminal Appeals noted, the defendants' statements in this case were redacted to remove any references to other co-defendants. Accordingly, our ruling in this case concerns only Tennessee Rule of Criminal Procedure 14(c)(2).

When two or more defendants are charged in the same indictment, evidence that is not necessarily applicable to another defendant may be admissible against one or more defendants. *State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing *Black v. State*, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990)). A defendant is not entitled to a separate trial merely because damaging proof is introduced against another defendant. *Id.*

We review a trial court's denial of a motion for severance under an abuse of discretion standard. *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008); *State v. Carruthers*, 35 S.W.3d 516, 552 (Tenn. 2000). A trial court abuses its discretion if it "applie[s] an incorrect legal standard or reache[s] a decision against logic or reasoning that cause[s] an injustice." *Dotson*, 254 S.W.3d at 387–88 (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (internal quotation marks omitted)). Under this standard, an appellate court will uphold a trial court's ruling if reasonable minds can disagree with the propriety of the decision, *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000), and will not substitute its judgment for that of the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). We do not interfere with the trial court's exercise of its discretion unless the denial of the motion for severance results in clear prejudice to the defendant. *Carruthers*, 35 S.W.3d at 552. Reversal is required only when the defendant establishes that he was "clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." *Id.* at 553 (quoting *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969), *superseded by statute on other grounds*, Tenn. Code Ann. § 27-111 (Supp. 1970)); *see Ellis v. State*, 403 S.W.2d 293, 294–95 (Tenn. 1966).

Here, the Court of Criminal Appeals found that Harbison was clearly prejudiced by the antagonistic nature of the defenses presented at the joint trial. *Harbison*, 2016 WL 4414723, at *20. The Court of Criminal Appeals acknowledged that mutually antagonistic defenses are not prejudicial per se and that few cases have been reversed on this ground due to the difficulty in establishing prejudice. *Id.* at *16 (citing *State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996)). The Court of Criminal Appeals quoted passages from *Zafiro v. United States* and *United States v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004), indicating that a joint trial can prevent a jury, under certain circumstances, from making a reliable judgment about guilt or innocence. *Harbison*, 2016 WL 4414723, at *17–19. The *Blankenship* court quoted *United States v. Gallo* and cited *United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980), where severance was found to be necessary. *See Blankenship*, 382 F.3d at 1124. These cases, however, are factually distinguishable from Harbison's case. In *Gallo*, sixteen defendants (fourteen defendants at the time of trial) were named in a twenty-two count indictment alleging a racketeering,

or RICO,[8] enterprise and conspiracy based on seventy-two predicate acts constituting forty-six separate offenses, and at least twenty-five schemes, operations, or courses of conduct. *Gallo*, 668 F. Supp. at 738–39. The district court ordered separate trials as to some of the defendants and ordered the rest to be tried with two or three other co-defendants. *Id.* at 746. Factors considered by the district court in granting the severances included the complexity of the indictment, the disproportionality of the evidence as to the different defendants, the antagonism of defense strategies, that some evidence was admissible only as to certain defendants, and the inadequacies of limiting instructions. *Id.* at 749–53. The district court noted that the case was "far too extensive and intricate to expect that a jury would be able to discern the myriad of subtle distinctions and mental gyrations that would be required by the inevitable plethora of limiting instructions necessary." *Id.* at 753. In Harbison's case, there were only three co-defendants, the indictment was not complex, and the evidence was neither disproportionate to the different defendants nor the "warehouse of diverse evidence" as in *Gallo. Id.*

In *Sampol*, eight defendants were charged in a multi-count indictment arising out of the murder of a former Chilean Ambassador to the United States and an American associate. *Sampol*, 636 F.2d at 629. Ignacio Novo Sampol ("Sampol") was indicted on two counts of making false statements to a grand jury and one count of misprision of a felony. His seven co-defendants were charged with more serious charges of conspiracy to murder a foreign official, murder of a foreign official, two counts of first-degree murder, and murder by use of explosives to blow up a vehicle engaged in interstate commerce. One co-defendant was also charged with making false declarations to a grand jury. The joint trial for Sampol and two other defendants lasted over a month. The jury found each defendant guilty of the charged offenses. The United States Court of Appeals for the District of Columbia Circuit reversed Sampol's convictions, finding that the district court abused its discretion in denying his motion for severance. *Id.* at 643. The appeals court considered the likelihood of confusion of charges from the indictment and evidence at trial, the likelihood of prejudice to Sampol based on the grossly disparate charges against him (making false statements and misprision) and his co-defendants (multiple counts of murder), and the inability of Sampol to present a full defense and to cross-examine witnesses implicating him in crimes for which he was not charged. *Id.* at 643–51. *Sampol* is distinguishable from Harbison's case based on the number of defendants, the length of the trial, the complexity of the indictment, the disparity in the charged offenses, and the evidence presented.

---

[8] RICO is the abbreviation for The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

After reviewing the record, we conclude that the trial court did not abuse its discretion in denying Harbison's motion for severance. In reaching this decision, we do not substitute our judgment for that of the trial court. The offenses in the indictment against Harbison, North, Brown, and Campbell all arose at the same time and place. The charged offenses were "closely connected in time, place, and occasion," and "it would [have been] difficult to separate proof of one charge from proof of the others." Tenn. R. Crim. P. 8(c)(3)(B). The trial court carefully considered Harbison's requests for severance before the trial, on the morning of the first day of trial, and at the hearing on the motion for new trial. The trial court based its decision on the correct legal standard, and its decision was reasonable under the circumstances. The trial court did not abuse its discretion in denying Harbison's motion for severance based on the number of defendants charged, the number of counts considered by the jury, the non-complex nature of the indictment, the length of the trial, the non-disparate evidence at trial against the defendants, the similar degrees of involvement by the defendants, and because Harbison was not hampered in presenting his defense at the joint trial.

To support his argument that he was clearly prejudiced by the trial court's abuse of discretion, Harbison offers only conclusory statements about hostility from courtroom spectators, hostility among the co-defendants, mutually antagonistic defenses, and admission of evidence about acts unrelated to Harbison. We will review each argument in turn.

First, Harbison contends that the trial court should have granted a severance because of the overt hostility between him and two of his co-defendants and courtroom spectators, the mutually antagonistic defenses, and his inability to present his defense. Hostility between defendants, attempt to cast blame on each other, finger-pointing, and tattling do not necessarily require a severance. *United States v. Arruda*, 715 F.2d 671, 679 (1st Cir. 1983) (citing *United States v. Talavera*, 668 F.2d 625, 630 (1st Cir. 1982)); *United States v. Angiulo*, 897 F.2d 1169, 1195 (1st Cir. 1990).[9] Like the Court of Criminal Appeals, we recognize that potential hostility among co-defendants exists where an indictment charges each co-defendant as a perpetrator of offenses against other co-defendants. Mutually antagonistic defenses among co-defendants may be the basis for granting a severance in some circumstances but are not per se prejudicial. *Zafiro*, 506 U.S. at 538.

---

[9] Although federal decisions are not binding on the state courts, decisions interpreting corresponding federal rules of procedure are helpful. *See State v. Phelps*, 329 S.W.3d 436, 445 (Tenn. 2010); *Henderson v. Bush Bros. & Co.*, 868 S.W.2d 236, 237 (Tenn. 1993).

Here, Harbison's defense was not necessarily mutually antagonistic with the defenses of his co-defendants, and he was not hindered in presenting his defense. Harbison maintained he never meant to harm anyone and fired his gun into the air only to prevent Brown from robbing L.P. and Q.T. Although Brown denied attempting to rob L.P. and Q.T., he admitted that he got out of Campbell's vehicle, approached L.P. and Q.T., and had them empty their pockets. Other witnesses who saw the incident also thought Brown was trying to rob them. The evidence established that Harbison and North exchanged gunfire with Brown and the occupants of Campbell's vehicle, but neither Brown nor Campbell offered any proof that Harbison fired any shots at them or intended to kill anyone. Although Brown denied that he fired a gun, numerous witnesses testified otherwise. Harbison claimed he was carrying a 9-millimeter handgun for protection on the day of the incident because he feared Brown and Campbell based on Harbison's suspicion that they had been involved in shooting into his mother's house. Harbison, however, failed to show that any antagonism or fear of Brown and Campbell necessitated a separate trial. Finally, the record contains no evidence that the jury was exposed to any courtroom hostility among the co-defendants or courtroom spectators.

Second, Harbison argues that the trial court's denial of a severance resulted in the admission of "lurid testimony and videos about guns, unindicted bad actors, and other crimes unrelated to Harbison and irrelevant to his charges." A severance should not be granted simply because there is a "[d]isparity in the evidence against the defendants," *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000), or a "speculative risk of a spill-over effect" from a co-defendant's prior bad acts. *Meeks*, 867 S.W.2d at 369. Harbison cites to testimony from Knoxville Police Department officers regarding the investigation into Lagrone's role in a drive-by shooting of Harbison's mother's house; police interviews of Brown, Campbell, North, and Harbison; and the video introduced to impeach Brown's testimony that he had never possessed a weapon. This evidence, however, does not incriminate Harbison and potentially places only Brown in a negative light. Although the Court of Criminal Appeals indicated that the evidence adduced during the joint trial caused the jury to treat the case as a "gang shooting" in which the participants were equally guilty, this is speculative; indeed, the trial court recognized this concern and limited the evidence of gang involvement to a few brief references. Also, the verdicts reveal that the jury's careful assessment of the evidence against each defendant resulted in Harbison's convictions on reduced charges of attempted voluntary manslaughter.

Third, Harbison argues that the trial court's acquittal of Brown and Campbell at the close of the State's proof of two robbery counts and that the trial court "relayed this to the jury prior to Harbison testifying" impeached and undercut his ability to present his defense. The record does not support Harbison's argument. The trial court, outside the presence of the jury, granted Brown's and Campbell's motions for acquittal on two of the

robbery charges and reduced the two remaining robbery charges to aggravated assault. This decision was not "relayed" to the jury before Harbison took the stand. In any event, Harbison effectively presented his defense that he fired his gun because he believed Brown was robbing L.P. and Q.T. The State's proof confirmed that other witnesses also thought Brown was robbing them. Harbison's defense was partially successful; the jury found Harbison guilty of the lesser included charges of attempted voluntary manslaughter, presumably finding that he acted in a state of passion produced by adequate provocation by the hostility of Campbell and Brown and Harbison's belief that Brown was robbing L.P. and Q.T.[10]

Next, Harbison argues that a severance was necessary to avoid prejudice from evidence that would not have been admitted had Harbison's trial been severed from his co-defendants. A trial court need not grant a severance when the evidence introduced at the joint trial would have been admissible against the defendant in a separate trial. *State v. Dellinger*, 79 S.W.3d 458, 468 (Tenn. 2002); *State v. Brown*, 795 S.W.2d 689, 693 (Tenn. Crim. App. 1990); *see State v. Alcorn*, 741 S.W.2d 135, 140 (Tenn. Crim. App. 1987). Harbison does not point to any specific evidence that would have been inadmissible in a separate trial but instead references "lurid testimony and videos about guns," "unindicted bad actors," and "other crimes unrelated to Harbison." Harbison appears to be primarily referring to the cell phone video that showed Brown and Legrone riding in a vehicle holding guns. This video, admitted into evidence solely to impeach Brown's testimony that he had never possessed a weapon, did not clearly prejudice Harbison. The jury may have concluded from the video that Brown's testimony was not credible, but this would not have hindered Harbison's defense. The trial court properly instructed the jury that "[a]ny evidence which was limited to a particular defendant should not be considered by you as to any other defendant."

Finally, Harbison argues that the evidence pertaining to multiple offenses and multiple co-defendants impaired the jury's ability to make an individual determination about each co-defendant. However, the trial court instructed the jury on its consideration of multiple defendants:

> You should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to that particular defendant. Any evidence which was limited to a particular defendant should not be considered by you as to any other defendant. You

---

[10] "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a).

can acquit all or convict all, or you can acquit one or more and convict the others.

The trial court also instructed the jury on self-defense, defense of a third person, and criminal responsibility. We presume that the jury follows all instructions given by the trial court, "with commonsense understanding of the instructions in the light of all that has taken place at the trial [that is] likely to prevail over technical hairsplitting." *State v. Knowles*, 470 S.W.3d 416, 426 (Tenn. 2015) (quoting *Boyde v. California*, 494 U.S. 370, 381 (1990)). To overcome this presumption, the defendant must show by clear and convincing evidence that the jury failed to follow the trial court's instructions. *State v. Newsome*, 744 S.W.2d 911, 915 (Tenn. Crim. App. 1987) (citing *State v. Vanzant*, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983)). Harbison has presented no evidence to overcome this presumption.

Although the jury considered evidence of multiple defendants and multiple offenses, its verdict reflects its fair assessment of the evidence, including the credibility of witnesses and application of the law as instructed. The jury's decision to convict Harbison on a lesser included charge (attempted voluntary manslaughter) indicates that it accredited Harbison's testimony that he did not intend to kill anyone but was provoked into firing his gun by the actions of Brown and Campbell. The jury's verdicts show that the jury understood and considered the relative positions of the co-defendants and followed the trial court's instructions to consider the guilt or innocence of each defendant individually. *See State v. Mickens*, 123 S.W.3d 355, 383–84 (Tenn. Crim. App. 2003) (finding no prejudice where trial court instructed the jury to consider evidence that a co-defendant flashed gang signs during the testimony of a State's witness only as to that co-defendant); *State v. Gaston*, No. W2001-02046-CCA-R3-CD, 2003 WL 261941, at *13 (Tenn. Crim. App. Feb. 7, 2003) (noting that a co-defendant's conviction of a lesser offense indicated the jury could distinguish between the different evidence presented against each defendant); *State v. Little*, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992) (holding that severance was unnecessary where the trial court instructed the jury to consider damaging testimony only as it related to and was admissible against co-defendants); *State v. Kyger*, 787 S.W.2d 13, 20 (Tenn. Crim. App. 1989) (finding no prejudice where jury was instructed to consider evidence against each defendant individually, and there was "considerable independent evidence" against the defendant).

We conclude that the trial court did not abuse its discretion in denying Harbison's motion for severance based on a finding that severance was not required for a fair determination of guilt or innocence.

The next issue we address is whether Harbison preserved a challenge based on double jeopardy to his multiple convictions for employing a firearm during the commission of a dangerous felony by raising the issue in the trial court and the Court of Criminal Appeals. The State argues that Harbison waived any challenge by not raising the issue in his motion for new trial and appellate brief. Harbison counters that he properly raised the issue.

To preserve the double jeopardy issue, Harbison had to raise it in his motion for new trial and appellate brief. *See State v. Bishop*, 431 S.W.3d 22, 43 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007)); *see also* Tenn. R. App. P. 3(e). Raising an issue in a motion for new trial allows the trial court to consider or reconsider the issue and make an appropriate ruling. *Fahey v. Eldridge*, 46 S.W.3d 138, 142 (Tenn. 2001) (quoting *McCormic v. Smith*, 659 S.W.2d 804, 806 (Tenn. 1983)). In a motion for new trial, the defendant must set forth the factual grounds on which he relies, the legal grounds for the trial court's ruling, and a concise statement as to why the trial court's decision was in error. *State v. Lowe-Kelly*, 380 S.W.3d 30, 33–34 (Tenn. 2012) (quoting *State v. Hatcher*, 310 S.W.3d 788, 802 (Tenn. 2010) (internal quotation marks omitted)). The contents of the motion should direct the attention of the trial court and prevailing party to the asserted error, and the movant should specify the issues with sufficient certainty to enable the appellate court to determine whether the issue was first raised in the trial court. *Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007) (citing *State v. Gauldin*, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)). However, a precise citation to a particular statute or case as the legal basis for the assertion is not required. *See Fahey*, 46 S.W.3d at 143. Grounds not raised in a motion for new trial are waived for purposes of appeal.[11] *See Waters*, 229 S.W.3d at 689 (citing *Boyd v. Hicks*, 774 S.W.2d 622, 625 (Tenn. Ct. App. 1989)).

Under Tennessee Rule of Appellate Procedure 36(a), a court need not grant relief to a party "who fail[s] to take whatever action [is] reasonably available to prevent or nullify the harmful effect of an error." Appellate briefs must contain a statement of the issues presented for review and an argument setting forth the appellant's contentions, reasons for appellate relief with citations to authorities and the record, and the applicable standard of review. Tenn. R. App. P. 27. Appellate review is generally limited to issues

---

[11] Issues not raised at trial may be reviewed in the discretion of the appellate court for plain error when these five factors are established: (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the defendant did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016).

presented for review. *See* Tenn. R. App. P. 13(b); *State v. Bishop*, 431 S.W.3d 22, 43 (Tenn. 2014) (citing *Hodge v. Craig*, 382 S.W.3d 325, 334–35 (Tenn. 2012)). An appellate court may decline to consider issues that a party failed to raise properly. *Bishop*, 431 S.W.3d at 43 (citing *State ex rel. D'Amore v. Melton*, 212 S.W.2d 375, 376 (Tenn. 1948)). Tennessee Rule of Appellate Procedure 13, however, allows the appellate court the discretion to consider other issues "(1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." Tenn. R. App. P. 13(b). When taken together, Rules 13(b) and 36(a) authorize appellate courts to give "complete relief to the parties as long as they have been given fair notice and an opportunity to be heard on the dispositive issues." *In re Kaliyah S.*, 455 S.W.3d 533, 540 (Tenn. 2015) (quoting *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000) (internal quotation marks omitted)).

In deciding whether a party has waived an issue on appeal, we do not exalt form over substance but instead review the record carefully to determine whether a party is raising an issue for the first time on appeal. *See Fayne v. Vincent*, 301 S.W.3d 162, 171 n.6 (Tenn. 2009). A party does not waive an issue by phrasing it differently in the trial court than on appeal. *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 143 n.1 (Tenn. 2001) (noting that "the failure to use the right label does not result in a waiver").

Here, Harbison filed a motion for new trial and two amended motions. Harbison's second amended motion asserted that "[i]t was error to allow the conviction of four counts of the use of a firearm during the commission of a dangerous felony. [Tenn. Code Ann. §] 39-17-1324. Only one conviction should have been allowed. There was only one weapon being used during the incident[.]" At the hearing on the motion for new trial, Harbison argued that the State overcharged the offenses in the indictment and that it was error to allow four convictions for employment of a single firearm during the commission of a dangerous felony. Harbison contended there should only be one conviction under Tennessee Code Annotated section 39-17-1324 based on his use of one weapon during one brief incident. The State responded that four firearm convictions were appropriate because Harbison used a firearm to commit four dangerous felonies involving four victims. The trial court overruled Harbison's motion, concluding that four firearm convictions were appropriate based on his conviction of four dangerous felonies with four distinct victims.

Although Harbison should have more clearly stated his assertion of error in the motion for new trial, we interpret the second amended motion for new trial and the argument on the motion for new trial to mean that Harbison was claiming that he was overcharged and convicted of multiple violations of Tennessee Code Annotated section 39-17-1324 based on a single act of employing one firearm. Although not well-stated, the disputed issue was whether the proper unit of prosecution was the act of employing the

firearm or the act of committing the underlying dangerous felony. Harbison focused on his use of a single weapon, while the State emphasized the multiple underlying dangerous felonies. Whether Harbison waived the issue of double jeopardy is a close question given his failure to use the phrase "double jeopardy" or "unit of prosecution" in the trial court. Although Harbison's constitutional argument was not a model of precision or clarity, we conclude that his amended motion for new trial was sufficient to direct the trial court's and the State's attention to his challenge to multiple convictions for employing a firearm during the commission of a dangerous felony when he fired a single weapon. Harbison's motions for new trial allowed the trial court to consider the issue and make an appropriate ruling. *See Fahey*, 46 S.W.3d at 142 (quoting *McCormic*, 659 S.W.2d at 806).

Harbison argued in the Court of Criminal Appeals that the trial court erred by not granting a new trial "where there was insufficient evidence to support conviction on more than one count of possessing a firearm during a dangerous felony, and where the Defendant possessed only one firearm during the shooting event." He further argued that the proper unit of prosecution was the number of firearms employed in the commission of a dangerous felony, and there was no proof he used more than one firearm during the single shooting event involving several individuals. The phrase, unit of prosecution, is uniquely associated with claims of error based on double jeopardy. *See Sanabria v. United States*, 437 U.S. 54, 69–70 (1978); *State v. Itzol-Deleon*, No. M2014-02380-SC-R11-CD, 2017 WL 3668453, at *4 (Tenn. Aug. 25, 2017); *State v. Feaster*, 466 S.W.3d 80, 84 n.2 (Tenn. 2015); *State v. Hogg*, 448 S.W.3d 877, 885–86 (Tenn. 2014); *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014); *State v. Watkins*, 362 S.W.3d 530, 543 (Tenn. 2012); *State v. Lewis*, 958 S.W.2d 736, 739 (Tenn. 1997); *State v. Tolbert*, 507 S.W.3d 197, 215 (Tenn. Crim. App. 2016); *State v. Branham*, 501 S.W.3d 577, 593 (Tenn. Crim. App. 2016); *State v. Aguilar*, 437 S.W.3d 889, 907 (Tenn. Crim. App. 2013); *State v. Franklin*, 130 S.W.3d 789, 797 (Tenn. Crim. App. 2003). As a result, the Court of Criminal Appeals construed Harbison's argument as a challenge to his firearm convictions based on double jeopardy grounds. *See Harbison*, 2016 WL 4414723, at *25. Although Harbison should have stated his argument with more precision, we hold that he preserved the double jeopardy issue at trial and on appeal and did not waive the issue.

*Double Jeopardy*

The jury convicted Harbison of four counts of employing a firearm during the commission of a dangerous felony in violation of Tennessee Code Annotated section 39-17-1324(b) based on his four convictions for the attempt to commit voluntary manslaughter. *See* Tenn. Code Ann. § 39-17-1324(i)(1)(C), (M). Based on the unappealed decision of the Court of Criminal Appeals that reversed one of Harbison's convictions for attempt to commit voluntary manslaughter and the accompanying firearm

offense, Harbison stands convicted of three counts of attempted voluntary manslaughter and three counts of employing a firearm during the commission of a dangerous felony.

The State argues there is no double jeopardy violation because the firearm-employment convictions stem from three distinct predicate felonies against three different victims. The State contends the unit of prosecution is each act of employing a firearm during the commission of a dangerous felony. Harbison argues that the Court of Criminal Appeals properly held that the multiple convictions for employing a firearm during the commission of a dangerous felony violated the constitutional prohibition against double jeopardy. Harbison contends that the unit of prosecution is the number of firearms used. Therefore, he cannot be convicted of more than one count of employing a firearm during the commission of a dangerous felony, regardless of the number of shots fired or the number of underlying convictions for predicate felonies, because he used only one firearm.

"Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo with no presumption of correctness." *Smith*, 436 S.W.3d at 766 (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)); *Watkins*, 362 S.W.3d at 539 (citing *Thompson*, 285 S.W.3d at 846).

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, protects individuals from "be[ing] subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amends. V, XIV. The double jeopardy clause of the Tennessee Constitution provides that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. These coextensive provisions afford separate protections for criminal defendants against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *Smith*, 436 S.W.3d at 766; *Watkins*, 362 S.W.3d at 541. The double jeopardy clause was intended to "prevent the criminal from being twice punished for the same offense as being twice tried for it." *Id.* at 541–42 (quoting *Ex Parte Lange*, 85 U.S. 163, 173 (1873) (internal quotation marks omitted)).

The prohibition against multiple punishments in a single prosecution prevents prosecutors from seeking and trial courts from imposing a sentence greater than the legislature intended. *Id.* at 542 (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)); *see also Lewis*, 958 S.W.2d at 739 ("When multiple sentences are imposed in a single trial," double jeopardy protection "is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." (quoting *Brown v. Ohio*, 432 U.S. 161, 165 (1977))). Where the legislature intended to allow multiple punishments, the imposition of multiple punishments does not constitute

double jeopardy. *See Watkins*, 362 S.W.3d at 542 (quoting *Albernaz v. United States*, 450 U.S. 333, 344 (1981)). The double jeopardy clause does not limit the legislature's authority to define criminal offenses and prescribe punishments for those offenses. *Id.* (citing *Brown*, 432 U.S. at 165).

Tennessee recognizes two types of single prosecution, multiple punishment claims: multiple description claims and unit-of-prosecution claims. *Smith*, 436 S.W.3d at 766 (citing *Watkins*, 362 S.W.3d at 543). A multiple description claim is one in which a defendant convicted of multiple criminal offenses under different statutes alleges that the convictions result in double jeopardy because the statutes punish the "same offense." *Id.* (citing *Watkins*, 362 S.W.3d at 544). A unit-of-prosecution claim arises when a defendant convicted of multiple violations of the same statute asserts that the multiple convictions are for the same offense. *Id.* (citing *Watkins*, 362 S.W.3d at 543).

Here, the central question is whether Harbison is being subjected to multiple punishments for the same offense. The answer to this question depends on how the unit of prosecution is defined for an offense under Tennessee Code Annotated section 39-17-1324(b). To determine the unit of prosecution, we first review the statutory language for an express definition. *Hogg*, 448 S.W.3d at 886 (quoting *Smith*, 436 S.W.3d at 768). If the unit of prosecution is clear from the statute, we apply the plain language without reviewing the legislative history. *Id.* (citing *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013); *see Smith*, 436 S.W.3d at 768 (citing *State v. Mata*, 321 P.3d 291, 295–96 (Wash. Ct. App. 2014)). If the plain language of the statute does not identify the unit of prosecution, we determine the legislature's intent by considering the legislative history and examining the statute's subject matter, "the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *Lewis*, 958 S.W.2d at 739 (quoting *Mascari v. Raines*, 415 S.W.2d 874, 876 (1967) (internal quotation marks omitted)). If there is ambiguity in defining the unit of prosecution, the "rule of lenity" resolves the ambiguity in favor of the defendant. *Id.*; *Watkins*, 362 S.W.3d at 543 (citing *Gore v. United States*, 357 U.S. 386, 391 (1958)).

We first review the language of Tennessee Code Annotated section 39-17-1324(b), which makes it a criminal offense to "employ a firearm during the: (1) Commission of a dangerous felony; (2) Attempt to commit a dangerous felony." A "dangerous felony" is defined to include numerous offenses, including attempt to commit first-degree murder and attempt to commit voluntary manslaughter. *Id.* § 39-13-1324(i)(1)(A)–(M). A violation of section 39-13-1324(b) is a "specific and separate offense, which shall be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony." *Id.* § 39-17-1324(d). Any sentence imposed for violation of section 39-13-1324(b) must be

served consecutive to any other sentence imposed for the conviction of the underlying dangerous felony. *Id.* § 39-17-1324(e)(1).

We conclude from the plain language of Tennessee Code Annotated section 39-17-1324 that it was the legislature's intent to punish a defendant for each act of employing or attempt to employ a firearm during the commission of a designated dangerous felony. Tennessee Code Annotated section 39-17-1324 did not limit the State to charging a single count of employing a firearm if multiple dangerous felonies were committed against multiple victims in a single criminal episode. The General Assembly could have imposed an express limitation as it did in subsection (c) of the statute which states:

> (c) A person may not be charged with a violation of subsection (a) or (b) if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged. In cases where possession or employing a firearm are elements of the charged offense, the state may elect to prosecute under a lesser offense wherein possession or employing a firearm is not an element of the offense.

*Id.* § 39-17-1324(c). It is significant that section 39-17-1324 provides that a violation of subsection (a) or (b) is a specific and separate offense and must be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony. Tenn. Code Ann. § 39-17-1324(d). This language reinforces the conclusion that the General Assembly has authorized a separate employing a firearm charge for each dangerous felony committed.

While not necessary for our consideration, we note the legislative history of the statute supports this conclusion. First, the caption of the bill, which we may consider in determining legislative intent, *Womack v. Corr. Corp. of Am.*, 448 S.W.3d 362, 366 (Tenn. 2014); *State ex rel. Rector v. Wilkes*, 436 S.W.2d 425, 428 (Tenn. 1968) (citing *Sealed Power Corp. v. Stokes*, 127 S.W.2d 114 (1939)), reads, in part:

> Whereas, the General Assembly . . . finds that reducing violent crime would greatly improve the safety and well-being of all Tennesseans; and . . . the General Assembly takes notice of significant decreased violent gun crime in other states following enhancement of punishment for repeat violent criminal offenders; and . . . the General Assembly recognizes that legal possession and use of firearms is a protected and highly valued fundamental right . . . but illegal possession and use of firearms is a major component of violent crime; and . . . the General Assembly has determined that focusing on the most hardened, violent, unrepentant criminals . . . who

- 20 -

endanger the public by committing crimes using guns is a logical way to improve government's performance in the area of public safely; and . . . the General Assembly finds that protecting public safety and preserving order is a primary obligation of government . . . .

2007 Tenn. Pub. Law Ch. 594 (S.B. 1967).

Statements made in Senate and House hearings indicate that Tennessee Code Annotated section 39-17-1324 was part of an anti-crime package and "designed to impose tougher sentences on those who commit crimes using guns." *Hearing on S.B. 1967 Before the S. Judiciary Comm.*, 105th Gen. Assemb. (Tenn. 2007) (statement of Sen. Mark Norris, Bill Sponsor). Representative John J. DeBerry, Jr., stated that the purpose of the corresponding House bill was to enhance gun crimes and incarcerate violent offenders for longer periods of time to get them "off the streets . . . so they are not out committing other crimes." *Hearing on H.B. 1835 Before the H. Fin., Ways & Means Comm.*, 105th Gen. Assemb. (Tenn. 2007) (statement of Rep. John J. DeBerry, Jr., Bill Sponsor).

Therefore, we conclude that the legislature intended the unit of prosecution for Tennessee Code Annotated section 39-17-1324 to be each act of employing a firearm during the commission of or attempt to commit a dangerous felony.[12] Nothing in the language of the statute indicates that the legislature intended to limit the unit of prosecution to the number of firearms employed by a defendant. Therefore, Harbison's three convictions for employing a firearm during the commission of a dangerous felony based on three convictions for the attempt to commit voluntary manslaughter involving three victims do not violate the prohibition against double jeopardy.

---

[12] *See State v. Waters*, No. W2015-01366-CCA-R3-CD, 2016 WL 4250146 (Tenn. Crim. App. Aug. 10, 2016) (The defendant was convicted of four counts of employing a firearm during the commission of a dangerous felony when he entered an apartment and fired at its occupants.), *perm. app. denied* (Tenn. Oct. 21, 2016); *State v. Gonzalez*, No. W2014-02198-CCA-R3-CD, 2015 WL 9171064 (Tenn. Crim. App. Dec. 15, 2015) (The defendant was convicted of three counts of employing a firearm during the commission of a dangerous felony when he fired a gun into a crowd of people.), *perm. app. denied* (Tenn. Apr. 7, 2016); *State v. Gray*, No. W2015-00049-CCA-R3-CD, 2015 WL 7536105 (Tenn. Crim. App. Nov. 24, 2015) (The defendant was convicted of four counts of employing a firearm when he shot at a house occupied by multiple victims.), *perm. app. denied* (Tenn. Mar. 23, 2016).

**III.**

After careful review, we reverse the judgment of the Court of Criminal Appeals that the trial court erred by not granting Harbison a separate trial and that his convictions for employing a firearm during the commission of a dangerous felony violated the prohibition against double jeopardy. We reinstate Harbison's three convictions for attempted voluntary manslaughter and three convictions for employment of a firearm during the commission of a dangerous felony and remand to the trial court for resentencing and corrected judgments. It appearing that LaJuan Harbison is indigent, we tax the costs of this appeal to the State of Tennessee.

_____
SHARON G. LEE, JUSTICE