IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 27, 2024 Session

## STATE OF TENNESSEE v. TIMOTHY DEWAYNE PINION

**Appeal from the Criminal Court for Knox County**
**No. 119009   Steven W. Sword, Judge**

_____

**No. E2023-01020-CCA-R3-CD**

_____

Defendant, Timothy Dewayne Pinion, was convicted after a jury trial of vehicular homicide by recklessness, reckless endangerment, two counts of driving under the influence (DUI), driving with a revoked license, failure to drive on the right side of the roadway, and violation of the financial responsibility law.  For these convictions, Defendant was sentenced to an effective fourteen years, eleven months, and twenty-nine days in confinement.  On appeal, Defendant argues that his dual convictions for vehicular homicide by recklessness and reckless endangerment violate principles of double jeopardy.  After a thorough review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and MATTHEW J. WILSON, JJ., joined.

Tyler M. Caviness (at motion for new trial and on appeal) and Dillon E. Zinser (at trial), Knoxville, Tennessee, for the appellant, Timothy Dewayne Pinion.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Gregory C. Eshbaugh and Robert B. DeBusk, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

This case arises from a November 15, 2020 collision on Norris Freeway between Defendant's Saturn sedan and a motorcycle, in which Vincenzo Bruno Cinelli ("the victim") was killed.

The May 2021 term of the Knox County Grand Jury returned a presentment charging Defendant with vehicular homicide by intoxication (Count 1); vehicular homicide by recklessness (Count 2); reckless endangerment with a deadly weapon of the victim and "other persons to the Grand Jurors unknown" (Count 3); DUI (Count 4); driving with a revoked license (Count 5); failure to drive on the right side of the road (Count 6); violation of the financial responsibility law (Count 7); aggravated vehicular homicide when Defendant had two prior DUI convictions (Count 8); and DUI second offense (Count 9). *See* Tenn. Code Ann. §§ 39-13-103, -213, -218; 55-10-401, -08-115, -12-139, -50-504. Prior to trial, the parties agreed to bifurcated proceedings relative to Counts 8 and 9.

At trial, Knox County Emergency Communications District records manager Michael Alan Mays testified that Knox County 911 received two calls on November 15, 2020, at 2:54 p.m., regarding a traffic accident on Norris Freeway. The evidence at trial established that the relevant section of Norris Freeway was a two-lane highway with a solid double yellow line dividing the northbound and southbound lanes. A written report and the recordings of the 911 calls were entered as exhibits.

In the first recording, a man who identified himself as Christopher Bruce reported that a traffic accident involving a motorcycle and a car had occurred on Norris Freeway and that it was "pretty bad." He said that both vehicles and drivers were in the woods.

In the second recording, a woman who identified herself as Tabatha Walker reported that a gray car had tried to "come around like four of us," that a "motorcycle was going down through there," and that the gray car had hit "him." Ms. Walker noted that the accident was the gray car's driver's fault. She stated that "he" was down an embankment.

Mr. Bruce testified that, on November 15, 2020, he and his girlfriend, Ms. Walker, left her mother's house driving separate cars and that Mr. Bruce's eight-year-old daughter rode with Ms. Walker. Mr. Bruce recalled that, after stopping at the corner of Norris Freeway and Weaver Cemetery Road, Ms. Walker turned left. Mr. Bruce waited for three cars traveling in the same direction as Ms. Walker to pass, then he turned left.

Mr. Bruce testified that the third car to pass him was "going extremely fast" in comparison to the other vehicles and that it concerned him. He identified Defendant as the driver of the third car. Mr. Bruce stated that he sped up to "try to catch him" because he was afraid that Defendant would run into Ms. Walker. Mr. Bruce saw Defendant move over into the oncoming lane and "then the impact was almost immediate." Mr. Bruce estimated that he was about 150 feet away from the collision when it occurred. Mr. Bruce noted that it "was just a big crash and then they both went into the tree line, off the left side of the road." Mr. Bruce did not see the victim's motorcycle before the accident, and he denied that he saw any of the vehicles in the line of traffic behind Ms. Walker apply their brakes.

- 2 -

Mr. Bruce testified that he did not see what happened to the victim during the crash, but he afterwards saw the victim "down in the ditch." Mr. Bruce stated that he pulled over, exited his car, and jogged back to the site of the accident. Mr. Bruce saw Defendant walking out of the woods, where his car had come to a stop. Mr. Bruce asked Defendant if he was okay, and Defendant responded affirmatively and asked Mr. Bruce, "Did you see him doing a wheelie?" Mr. Bruce replied, "No, you crossed over into his lane." Mr. Bruce stated that Defendant said something similar to "go, go help him[.]"

On cross-examination, Mr. Bruce testified that, when he accelerated to catch up to Defendant, he did not pass any vehicles. Mr. Bruce acknowledged that his statement, as documented in the Tennessee Electronic Traffic Crash Report ("the crash report"), reflected that he was 300 feet away from the accident; he clarified that he pulled over 300 feet past the accident site. He noted that most of the debris went to the left of the road and into the tree line. Mr. Bruce acknowledged that, in his 911 call, he stated that Defendant had moved into oncoming traffic but did not state that Defendant was trying to pass another car.

Ms. Walker testified that she was a certified nursing assistant and that she also witnessed the accident. She stated that, after driving away from her mother's house with Mr. Bruce following in his car, she stopped before turning left onto Norris Freeway. Ms. Walker initially did not see anything that concerned her while she was driving, and she stated that her car was first in a line of traffic. Ms. Walker estimated that she was driving between forty-five and fifty miles per hour, and she noted that the speed limit "gets up to [fifty] right there" and that she was trying to speed up because of the cars behind her.

Ms. Walker testified that, at a curve in the road, she saw in her rearview mirror a car "passing . . . two to three vehicles behind [her]," which made her nervous. Ms. Walker identified Defendant in the courtroom as the car's driver. She also noticed that a motorcycle was driving toward her and that Defendant "kept trying to pass as the motorcycle was coming." Ms. Walker denied that the motorcycle was "popping a wheelie" or that she slammed on her brakes or slowed down prior to the accident. She stated that, in relation to her speed, Defendant was driving "[v]ery fast" and that he was gaining on her. Ms. Walker elaborated that she initially thought Defendant may have been racing someone due to his speed. Ms. Walker clarified for the trial court that she saw Defendant "come around" the line of traffic to her left.

Ms. Walker testified that because she thought something bad was about to happen, she used Siri to dial 911 just before Defendant and the motorcycle collided. She stated that the collision occurred "right . . . at [her] window" seconds after she saw Defendant begin to pass the other cars. When asked to describe the collision, Ms. Walker stated, "It was very horrible. I remember, . . . the driver of the car just, like, came flying . . . . [H]e hit the motorcycle, the driver of the motorcycle popped up onto the windshield and then down

- 3 -

into the hood." Ms. Walker denied hearing screeching tires or seeing any braking prior to the accident.

Ms. Walker testified that she parked in a "gravel pull-off" at the curve in the road, spoke to the 911 dispatcher, and ran to the victim to see if she could help. She stated that the victim was down an embankment and that he was bleeding around the neck, right arm, and one leg. Ms. Walker stated that the victim's other leg was a prosthetic. Ms. Walker applied pressure to the bleeding to his leg and arm with her jacket and attempted CPR, but she said that "there was . . . no . . . airway at all" and that she was unable to revive him. She stated that she stayed with the victim until the paramedics arrived and that she conveyed to them that he was deceased "upon arrival."

Ms. Walker testified that an officer asked her to step up onto the embankment and that she saw Defendant, who had some blood on his arm. Ms. Walker realized he was the car's driver and asked him what happened. According to Ms. Walker, Defendant responded, "[T]hat man was . . . popping a wheelie, flying up through there." Ms. Walker replied, "[N]o, he was not," and Defendant walked away.

On cross-examination, Ms. Walker testified that, at the time of the collision, Defendant's car was beside her window, and the victim was just ahead of her car. She stated that she and the two cars immediately behind her were close together and that Defendant did not return to the right lane during his attempt to pass the cars.

After listening to the recording of her 911 call, Ms. Walker acknowledged that she referred to the car's driver using female pronouns. She stated that she began the 911 call in her car, pulled over, and exited her car and began running while she remained on the line with the dispatcher. She agreed that she simultaneously watched her speed, called 911, and looked in the rearview mirror at Defendant's car.

When asked whether she identified Defendant as the driver based upon the statements of other people at the scene, Ms. Walker responded negatively and said that she assumed Defendant was the driver because he had blood on his arm. Ms. Walker stated that the victim was wearing a helmet but that pieces were missing such that his face was visible.

On redirect examination, Ms. Walker testified that cell service was poor in that area and that it took a "little bit" to reach 911. She stated that she did not initially know the gender of the car's driver.

Tennessee Highway Patrol (THP) Trooper Jacob Clabough testified that, on November 15, 2020, he was the first trooper to respond to the accident scene. Trooper Clabough spoke to Defendant, who stated that he was the driver. Defendant reported that

his arm hurt and that it might be broken. Trooper Clabough described Defendant as having a "very nervous, anxious, adverse mental state at that point in time" but also said that Defendant was cooperative. Trooper Clabough described an "adverse mental state" as, "Very hypertensive . . . . You have individuals who . . . are under distress or . . . under the influence, possibly, that have taken something that could . . . mean that they're on a stimulant, something that's going to accelerate their . . . heart rates -- their overall ability to function properly." Trooper Clabough stated that Defendant seemed "hyperactive" and that he had paramedics escort Defendant to an ambulance to be treated.

On cross-examination, Trooper Clabough testified that he also spoke to Mr. Bruce and Ms. Walker at the scene. He estimated that he arrived about five minutes after the accident occurred. Trooper Clabough agreed that Defendant had blood on his injured arm; he opined that Defendant appeared to be in "slight pain[.]" Trooper Clabough stated that he and other troopers at the scene did not perform any DUI investigation. He stated that Defendant remained on the scene until he was transported to the hospital, and he agreed that the accident was not a "hit-and-run situation[.]" Trooper Clabough denied that he arrested Defendant or issued him a citation.

THP Trooper Chris Hutchins testified that, on November 15, 2020, he was dispatched to the University of Tennessee Medical Center to speak to Defendant. Trooper Hutchins stated that he obtained a "legal blood/alcohol kit" from Defendant. A copy of the "Tennessee Blood and/or Breath Consent Advisement" was entered as an exhibit and reflected that Defendant consented to have blood drawn for testing. Trooper Hutchins observed the blood draw; he noted that he signed the form for Trooper Ricky Powers, who was the investigating trooper at the scene. Trooper Hutchins identified a corresponding Tennessee Bureau of Investigation (TBI) toxicology request form, which was entered as an exhibit. The form contained a box labeled, "Comments: (known diseases, drugs suspected, etc.)," in which "meth, [S]uboxone" was written. Trooper Hutchins noted that, generally, the information on suspected drugs would have come from Defendant or evidence found in Defendant's car.

On cross-examination, Trooper Hutchins testified that, based upon the handwriting on the toxicology request form, he believed that Trooper Powers wrote the note about suspected drugs. Trooper Hutchins estimated that he spent about twenty minutes with Defendant at the hospital. Trooper Hutchins stated that Defendant was in a hospital bed and that he did not perform any field sobriety tests on him or administer a breathalyzer.

THP Trooper Powers testified that he was the principal investigator at the accident scene. When asked to describe the scene, Trooper Powers testified,

There was skid marks that you could see . . . on the double yellow line, one of which was actually on the southbound side, like, in the lane. There both

vehicles were off the . . . southbound shoulder of the roadway, in the tree line. And the body of the motorcyclist was about 20 yards down the embankment, off the roadway.

Trooper Powers testified that he briefly spoke to Defendant, who "appeared fatigued and his pupils appeared to be overly constricted[.]" Trooper Powers did not know if the paramedics had administered any medication to Defendant at that time. Trooper Powers stated that Defendant told him that "the vehicles that were in front of him stopped suddenly and it made him stop suddenly and he went into a skid and the motorcycle pretty much came out of nowhere." Trooper Powers said that he did not observe "any signs of heavy braking" on the road in the northbound lane preceding the skid mark on the double yellow line.

Trooper Powers testified that he and other officers marked various parts of the scene with spray paint to assist the Critical Incident Response Team (CIRT) in reconstructing the crash. He identified an accident diagram he made, which reflected that Defendant's car, which was traveling north, crossed the yellow line into the southbound lane and that the victim's motorcycle, which was traveling south, hit the front driver's side corner of Defendant's car. The motorcycle continued traveling south and to the victim's right, coming to rest in front of the tree line; Defendant's car continued traveling north and to his left, coming to rest just inside the tree line.

Trooper Powers identified a certified copy of Defendant's driving record, which reflected that his driver's license had been revoked on December 25, 2014. Trooper Powers noted that he was never provided with any insurance information for Defendant's car.

Trooper Powers testified that he photographed the accident scene using his cell phone because his digital camera was inoperable. The photographs were received as an exhibit and reflected low-resolution images of the scene, including debris in the road. Trooper Powers noted that he identified the area of impact by "fluid trails and the concentration of debris within that area." He stated that one photograph showed a door from Defendant's vehicle in the road. The photographs reflected that Defendant's car was in the tree line off the highway's shoulder perpendicular to the road; its back end was raised slightly. A large piece of the victim's motorcycle and the victim's body were nearby in a bed of leaves. Additional photographs showed spray-painted markings on the pavement, which Trooper Powers noted marked "scrapes" made by the rim of the victim's motorcycle in the southbound lane and the "path of travel" of Defendant's car as it left the road.

Further photographs showed Defendant's car once it had been towed back to the road. Although the front of Defendant's car was extensively damaged, the most damaged portion was the front driver's side corner; the front driver's side wheel was bent almost

- 6 -

perpendicular to the car, and the driver's side hood folded toward the center. The front driver's side windshield was shattered as though something large had impacted it, and a large piece of the front driver's side door was missing. The car's air bags had deployed. Photographs of the victim's motorcycle reflected that the front wheel was missing.

Trooper Powers testified that one photograph of the interior of Defendant's car showed an orange "makeshift straw" with a "band wrapped around it" in the front passenger's seat. Trooper Powers stated that the straw "appeared to have a white powdery residue" but that he did not collect it as evidence because "there was nothing to go with it. It was just documented by photo." He said that he noted the straw in the CIRT report and that he filled out the suspected drugs section in the toxicology request form. Trooper Powers stated that he learned about the possibility of methamphetamine and Suboxone from Sergeant Joe Walker's interview, although he was not present for the interview.

Trooper Powers testified that the victim was wearing a "DOT approved helmet[.]" He stated that he went to the hospital and gave Defendant copies of paperwork. Trooper Powers said that Defendant was not charged on the day of the crash because they were waiting for the toxicology report. He agreed that Defendant was admitted to the hospital that day.

On cross-examination, Trooper Powers testified that Defendant's car had crashed into "several trees[.]" Trooper Powers stated that, at the time he completed the crash report, he had not yet received the toxicology report. He agreed that the report was amended on February 14, 2021, once he learned of the toxicology results.

Trooper Powers identified a copy of the crash report, which was received as an exhibit. A section entitled "Narrative" read as follows:

> On 11/15/2020 Vehicle #1 was traveling Northbound on Norris Freeway/US 441. Vehicle #2 was traveling Southbound on Norris Freeway/US 441. Vehicle #1 crossed over from the Northbound lane of travel into the Southbound lane of travel, which resulted in the front end of Vehicle #1 making contact with the front end of Vehicle #2. Vehicle #1 came to an uncontrolled final rest off of the right side of the roadway in the tree line facing west. Vehicle #2 came to an uncontrolled final rest off of the right side of the roadway facing north, Southbound on Norris Freeway/US 441.

Under a section entitled, "Alcohol and Drugs," the report reflected that officers did not suspect alcohol use but did suspect drug use; the "[d]etermination [m]ethod" listed was "[o]bserved." He agreed that the report's narrative did not include that Defendant was passing other cars. Trooper Powers estimated that he spent five minutes or fewer with

Defendant at the scene; he noted that Defendant was taken to the hospital shortly afterward. He agreed that a slight curve in the road existed at the location of the crash.

Trooper Powers identified a copy of a November 15, 2020 memorandum he wrote, which stated as follows:

> On 11/15/2020 at approximately 14:57 I was dispatched to Norris Freeway/US 441 and Weaver Cemetery Road for a personal injury crash involving two vehicles. Upon first contact with Driver #1 he appeared to be fatigued and his pupils seemed to be overly constricted. Driver #1 was asked to explain what had happe[ne]d, to which Driver #1 stated that other vehicles in front of him were braking suddenly and that he had to [brake] suddenly, which made his vehicle skid and that the motorcycle came out of nowhere. Witness statements indicated that Vehicle #1 had passed multiple vehicles on the wrong side of the road, which resulted in a head on collision with Vehicle #2.
>
> . . . .
>
> During an inventory of Vehicle #1 before it was towed, a makeshift straw with white powdery residue was located in the passenger seat of the vehicle.

He reiterated that the straw was not collected or sent for testing because "[t]here wasn't anything to go with the straw. It was just the straw itself."

A Tennessee Department of Safety and Homeland Security form entitled "Vehicle Tow-In Report/No-Tow Request Liability Release Report" was received as an exhibit and contained Defendant's car's information, as well as the location to which it was towed. A section of the form titled "Inventory performed, list items inventoried" contained a written note reading, "Airbag from front[.]" Trooper Powers acknowledged that the inventory section" did not mention the straw, commenting, "That's made for items of value, not evidence." He stated that he included the front airbag in the inventory section to document that the airbags had deployed; he noted that Defendant's car was "too damaged to crawl around inside of it."

Trooper Powers testified that he did not perform field sobriety tests on Defendant at the scene or the hospital due to his injuries. He stated that he did not administer a breathalyzer test because alcohol was not suspected. He agreed that he did not perform any DUI investigation. Trooper Powers agreed that he had arrested many people for DUI in his career and that he had previously arrested people who had been in car accidents. Trooper Powers agreed that Defendant was not arrested or issued a citation until May 20, 2021.

On redirect examination, Trooper Powers clarified that, although he did not have Defendant attempt field sobriety tests, he had Defendant's blood collected to be sent to the TBI for testing. He agreed that his memorandum included the witnesses' statements that Defendant was passing other cars on the wrong side of the road. Trooper Powers agreed that Defendant had "no indicators of alcohol use" such as the smell of alcohol.

On recross-examination, Trooper Powers affirmed that he did not initially include the suspected drug use in his narrative in the crash report. He agreed that he added a final sentence to the narrative denoting the toxicology results in February 2021.

On further redirect examination, Trooper Powers testified that, when he amended the crash report in February 2021, he did not change the portion of the form in which he indicated that he suspected drug use. He agreed that the toxicology results confirmed his suspicion.

THP Sergeant Joe Walker testified that he interviewed Defendant at the hospital on November 15, 2020. He identified a transcript of the interview, which was entered as an exhibit with the audio recording. The parties stipulated that the transcript matched the audio.

In the recording, Defendant stated that he was driving the Saturn vehicle "the motorcycle hit." He stated that he left his home to go a convenience store and was driving behind a "loud" red Honda or Toyota vehicle. When they came "over the hill and around the curve," the following events occurred:

> There was a car hitting their brakes . . . . I don't know if they was trying to stop or if they was fixing to turn or what but the car in front of me, the little Honda slammed on his brakes and I slammed on mine and I start sliding. I slid over, tried to avoid him and I don't know where that guy on the motorcycle came from but he was just there.

Defendant said that, when he started sliding, his car went across the yellow line. He also said, though, that he "thought [he] went across . . . close to it." He reiterated that he was trying to avoid hitting the car in front of him. Defendant noted that, after the crash, he did not see the car that was initially in front of him but that another car was there. Defendant denied that anything was wrong with his car or that he had been using his cell phone at the time of the accident. He stated that he was wearing a seatbelt and that he was driving "about the speed limit[.]"

Defendant stated that he had gone to bed the previous evening between 10:00 and 11:00 p.m., that he slept until 8:00 or 9:00 a.m., and that he "sat around the house" watching television earlier that day. Defendant stated that he was going through a divorce and was

"so stressed out." He said that he did not leave the house before he left to go to the store. Defendant stated that he did not drink alcohol. He said that he had been taking Suboxone for three years because he used to take oxycontin five years previously.

When asked whether he used illegal drugs, Defendant responded, "Yes, I, I've did meth every now and again." Defendant stated that he had last used methamphetamine three or four days before the accident. Defendant noted that he had only used methamphetamine because he was "stressed out" and that he did not like it. He stated relative to quantity that he used a "bump of the line." Defendant said that someone had given the methamphetamine to him. He said again that he was "d--n stressed out" because his wife had shown him a photograph of herself with her boyfriend. He noted that he had wanted to go drink but had stayed home instead. Defendant averred that he had not drunk alcohol in a year, noting that he had "tried to turn [his] life around." Defendant stated that he was depressed.

The State entered as an exhibit Defendant's medical records from his November 15, 2020 ambulance transport and hospital visit. The State drew the jury's attention to Defendant's blood pressure at 3:08 p.m., which was 171/93, as well as Defendant's having received intravenous fentanyl citrate at 3:22 p.m. The medical records also reflected that Defendant had fractures in his arm and a rib.

TBI Special Agent Melanie Carlisle testified as an expert in forensic toxicology that, according to the toxicology request form, Defendant's blood was drawn at 4:52 p.m. on November 15, 2020. She stated that alcohol testing on the blood sample was negative but that it tested positive for buprenorphine, also known as Suboxone, "at 2 nanograms per milliliter, and . . . norbuprenorphine at 2 nanograms per milliliter"; she noted that norbuprenorphine was a metabolite of Suboxone. Agent Carlisle said that Suboxone was a painkiller that was also used to treat addiction to painkillers. Agent Carlisle testified that Defendant's blood also tested positive for methamphetamine at "0.89 micrograms per milliliter" and amphetamine, which was a methamphetamine metabolite, at "0.16 micrograms per milliliter."

Agent Carlisle testified that methamphetamine was a central nervous stimulant that was no longer used for medical purposes and that most current methamphetamine use was illicit. She stated that it caused insomnia, tremors, excitedness, and a "very agitated-type of state." She agreed that it could cause high blood pressure. Agent Carlisle noted that "there's also a crash phase to methamphetamine. Once your body has been stimulated so long, it has to crash, and then you start a depressing phase of the methamphetamine." Agent Carlisle testified that methamphetamine use could cause erratic driving, failure to maintain one's lane, and "a lot of risk taking in your driving skills."

- 10 -

Agent Carlisle said that, as "an active metabolite," amphetamine caused similar effects. She noted that, although amphetamine had a legitimate use as an ADHD medication, because methamphetamine was also present in the blood sample, this amphetamine was "more than likely" a metabolite of the methamphetamine.

Agent Carlisle testified that, when methamphetamine was still used for medical purposes, the therapeutic dose was ".01 to . . . .05 micrograms per milliliter." She noted that Defendant's level of 0.89 micrograms per milliliter was "well over that range." She stated that, if a person had never used methamphetamine before, a blood level of 0.89 micrograms per milliliter could cause "significant . . . heart problems, blood pressure problems, because it is at a high level." She noted that, similar to alcohol, a person who regularly used methamphetamine might not have "significant signs of impairment[.]" Agent Carlisle estimated that the "half-life" of methamphetamine was about fifteen hours.

Agent Carlisle testified that buprenorphine had "more of a depressing effect" and could cause increased reaction times. She noted that the combination of two or more different types of drugs affected individuals differently.

Agent Carlisle testified that fentanyl was in the same "instrumentation and analytical test" as Suboxone and that, when she confirmed Suboxone in Defendant's blood sample, "what [she] found was an indication of fentanyl. It was just below [her] detection limits[.]" She stated that "there is a possibility of fentanyl," which was consistent with the fentanyl administered by medical personnel. She noted that she could not determine whether a medication was dispensed illicitly or medically. Agent Carlisle stated that it would be "very unlikely" for medical personnel to have administered methamphetamine because it had no therapeutic use.

On cross-examination, Agent Carlisle testified that many factors influenced how a drug affected an individual and that her expertise did not extend to determining the effects of a drug on a specific person. She agreed that other classes of drugs were not detected in Defendant's blood.

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified that she performed the victim's autopsy. She stated that the manner of death was an accident and that the cause of death was multiple blunt-force injuries; she noted that, unless a car had been purposefully used as a weapon, the manner of death was deemed accidental and did not indicate that no criminal culpability existed. She noted that the criminal or legal aspect of cases was "never [her] concern."

Dr. Mileusnic-Polchan testified that the majority of the trauma to the victim's body was to the neck and chest. She noted that, because the victim wore a helmet, there was minimal trauma to the head except for injuries caused from "the broken glass in the midline

of the face." She stated that a twelve-inch laceration on the neck "half decapitated" the victim, tearing the skin and muscle and transecting the brachial artery. She said that there was "atlanto-occipital dislocation" and two crushed vertebrae, which "translated to . . . injury to the spinal cord and brain stem and the vessels around the spinal cord . . . that actually carry the blood to the posterior part of the brain." Dr. Mileusnic-Polchan explained that the brain was deprived of circulation, which severely damaged the brain stem and spinal cord.

Dr. Mileusnic-Polchan testified that, on the victim's chest, there were fractures to the sternum, clavicle, and seventeen of twenty-four ribs, as well as injury to the pulmonary arteries and bronchi and a laceration to the right side of the heart. The autopsy report reflected that the laceration perforated the right ventricle. She stated that the aorta was "almost transected or torn in three places" and that the injury would have led to immediate, severe bleeding and loss of consciousness.

When asked how the victim's injuries compared to other motorcycle fatalities she had seen, Dr. Mileusnic-Polchan testified that she "never [saw] almost like a half decapitation," that the victim's wounds were "very severe," and that an aortic laceration usually only occurred at one location, not three.

Dr. Mileusnic-Polchan testified that the victim's blood tested positive for "Delta-9 THC," which was "the parent compound of marijuana," and "Delta-9 Carboxy THC," an "inactive metabolite" of marijuana. She noted that she generally did not incorporate toxicology findings as contributing to the cause of death in motor vehicle accidents, particularly if the deceased did not cause the accident; she noted that trauma obviously caused the victim's death. Dr. Mileusnic-Polchan stated that the levels were "relatively . . . low," and she noted that substances could be present longer in the blood and urine of "chronic users."

On cross-examination, Dr. Mileusnic-Polchan testified that Knox County Regional Forensic Center investigator Amanda Eiriksson, who responded to the scene of the accident, prepared a "narrative of circumstances surrounding death" as part of the medical-legal death investigation. Dr. Mileusnic-Polchan acknowledged that the narrative stated that Defendant's car crossed the double yellow line while trying to pass another vehicle but did not state that Defendant was trying to pass four vehicles. Dr. Mileusnic-Polchan agreed that the narrative stated that "the motorcycle was sideswiped by the Saturn," but she explained that this came from "the original . . . exchange of information between the law enforcement, the witnesses and our investigators. And that's why . . . at the bottom of the report, [they] always say the investigative information provided in the above report is subject to change as new information becomes available."

Dr. Mileusnic-Polchan agreed that her office worked with law enforcement, not for law enforcement. She stated that she would trust the reliability of her investigators' observations and interactions with law enforcement and witnesses. She agreed that one of the victim's legs had been amputated at the knee at some point before the accident. She stated that the victim was wearing a full-face helmet. She could not opine whether the helmet had been removed and placed back on prior to the victim's arrival at the Forensic Center.

THP CIRT Lieutenant Justin Boyd, an expert in crash reconstruction, testified that Sergeant Charles Massengill, who passed away two weeks before the trial, compiled the crash reconstruction report in this case. Lieutenant Boyd was his supervisor and reviewed the report before approving it in May 2021. Lieutenant Boyd stated that the CIRT went to the accident scene on November 20, 2020, and that Sergeant Massengill took photographs and used the "Leica TS16 Robotic Total Station" (Total Station) to map the crash site, roadway, and evidence marked with paint by troopers on the day of the accident.

Lieutenant Boyd identified a scale diagram of the crash scene, as generated by the Total Station, which reflected a tire mark beginning south of the "area of impact" and ending after it. Two tire marks and scratch marks were noted to the left of the yellow line, generally leading from the area of impact to Defendant's car. Lieutenant Boyd noted that they could not identify a point of impact but rather referred to an area of impact.

Lieutenant Boyd testified that the right lane of the diagram was the northbound travel lane, and the left lane was the southbound travel lane. He stated that the troopers at the scene marked a tire mark near the double yellow line, which he said was created by the Saturn's passenger-side tires, and another tire mark created by the Saturn's driver-side tires, which were created "as it exit[ed] to final rest." The troopers also marked a fluid trail. Lieutenant Boyd noted that no evidence of additional tire marks existed at the scene.

Lieutenant Boyd testified that a change in direction of the tire marks occurred at the area of impact with the victim's motorcycle, which shifted Defendant's car to the side. He stated that Defendant's car traveled seventy-six feet from the area of impact.

Lieutenant Boyd testified that Sergeant Massengill also visited a tow lot to photograph the victim's motorcycle and Defendant's car. Lieutenant Boyd opined that the damage to Defendant's windshield was caused by the victim's and the motorcycle's striking the windshield and "A-pillar" of the car. He stated that the car also had significant damage to the steering mechanism. Lieutenant Boyd identified "body fluid" or blood on the inside of the driver's side door jamb.

Lieutenant Boyd testified that Defendant's statements about the accident were inconsistent with the on-scene evidence and that no physical evidence supported

Defendant's assertion that he made a "hard brake application" going from the northbound lane to the southbound lane. He opined that Ms. Walker's and Mr. Bruce's statements that Defendant was trying to pass other vehicles was consistent with the evidence "due to the fact of where his brake marks start and how the vehicle exits the roadway." Lieutenant Boyd stated that Defendant's being on the wrong side of the road caused the crash; he noted that he agreed with Sergeant Massengill's opinion in his report that "impairment played a factor."

On cross-examination, Lieutenant Boyd testified that the scene had "tire marks on the double yellow line going northbound." He opined that the tire marks on or near the yellow line, which were created by Defendant's passenger-side tires, were "skid marks" indicative of braking. Lieutenant Boyd stated that it was "clear by the tire marks" that part of Defendant's car was in the northbound lane when the impact occurred and that he was not completely in the southbound lane. He agreed that he would not characterize the accident as a head-on collision; he noted, though, "But . . . when we start dealing with motorcycles, it's not like cars, you don't have that overlap – we're going into splitting terms of a head-on [collision]. We've got a small frame striking along that left side." Lieutenant Boyd testified that, based upon the photographs and the absence of tree bark, he did not think that trees could have caused "that amount of damage" to Defendant's car, although he acknowledged the possibility that some of the damage could have been caused by Defendant's driving into the tree line.

At the conclusion of the State's evidence, Defendant did not present any proof. During the State's closing, relative to reckless endangerment, the prosecutor argued,

> [Defendant] is also charged with reckless endangerment. And the State's allegations here are that, [Defendant], the way that he was driving that day endangered everyone on the roads, not just [the victim], but he put Ms. Walker in danger, he put the other vehicles on the road in danger, and that the way that he used his vehicle constituted a deadly weapon. I mean, as we can see, someone died.

The jury convicted Defendant of the lesser-included offense of DUI in Count 1; vehicular homicide by recklessness in Count 2; reckless endangerment with a deadly weapon in Count 3; DUI in Count 4; driving on a revoked license in Count 5; failure to drive on the right side of the road in Count 6; and failure to provide proper evidence of financial responsibility in Count 7.

The trial court announced to the jury the second phase of the proceeding; it noted that because the jury acquitted Defendant of vehicular homicide by intoxication, Count 8, aggravated vehicular homicide "does not apply [and] . . . is dismissed." The State entered

as exhibits certified copies of Defendant's driving history and the affidavit of complaint and judgment in Knox County General Sessions Warrant No. @1076341, in which Defendant was found guilty of DUI on November 12, 2014. The jury convicted Defendant of DUI second offense in Count 9.

At the sentencing hearing, the State noted that, according to the presentence report, Defendant had the following criminal history:

| Date of Conviction | Offense | Docket Number | Court |
|---|---|---|---|
| 5/21/20 | Vandalism (felony) | 117498 | Knox Co. Criminal |
| 8/27/19 | Vandalism (misdemeanor) | @1322921 | Knox Co. General Sessions |
| 8/27/19 | Simple possession | @122659 | Knox Co. General Sessions |
| 3/1/19 | Possession of drug paraphernalia | @1283310 | Knox Co. General Sessions |
| 11/12/14 | DUI | @1076341 | Knox Co. General Sessions |
| 11/26/13 | Attempted aggravated assault | 102324 | Knox Co. Criminal |
| | Burglary (other than habitation) | | |
| 5/22/12 | Driving without a license | @974434 | Knox Co. General Sessions |
| 2/6/04 | Evading arrest (felony) | 78627 | Knox Co. Criminal |
| | Reckless endangerment with a deadly weapon | | |
| | Driving with a revoked license | | |

- 15 -

| 1/21/04 | Theft (misdemeanor) | 03ST287 | Anderson Co. General Sessions |
|---------|---------------------|---------|-------------------------------|
| 4/25/03 | Aggravated burglary | 76490 | Knox Co. Criminal |
| 5/20/03 | Possession of drug paraphernalia | @598761 | Knox Co. General Sessions |
| 5/20/03 | Assault | @591852 | Knox Co. General Sessions |
| 5/20/03 | DUI | @591616 | Knox Co. General Sessions |
| 12/15/98 | Driving without a license | 180544F | Knox Co. General Sessions |

The presentence report included juvenile court adjudications for possession of drug paraphernalia and disorderly conduct at age sixteen. Defendant also had a pending assault charge in Anderson County.

The State noted infractions committed while Defendant was in custody. In TDOC custody, on January 30, 2015, Defendant was found to be in possession of a deadly weapon. On May 17, 2017, Defendant possessed or used a tobacco product while in custody. While in Knox County custody, on July 22, 2021, Defendant made, used, or possessed "intoxicants" and refused a lawful order.

The report also reflected that Defendant's probation had been revoked on December 5, 2003; April 13, 2007; and November 6, 2014. In addition, he failed to report on September 1, 2004, and February 24, 2021.

The State noted that Defendant was released on probation in Knox County Criminal Court case number 117498 when he committed the offenses in this case. The State noted that the trial court was considering an additional violation of probation warrant on the day of the sentencing hearing, and Defendant asserted that he was "going to submit on the violation so that the [c]ourt may undergo a cumulative sentence to resolve all issues." The trial court stated, "Yeah. That was for curfew and absconding prior to these offenses."

The presentence report reflected that Defendant dropped out of high school in the eleventh grade. Defendant reported that he used marijuana three or four times weekly from age fourteen until 2019; methamphetamine on a monthly basis from 2017 until November 2020; cocaine three or four times weekly from ages fifteen to thirty; and Suboxone twice weekly in 2015. He stated that he drank a twelve-pack of beer on the weekends from age twenty until 2017. Defendant stated that he completed twenty-one days of a substance

- 16 -

abuse program in 2014. The STRONG-R assessment rated Defendant a moderate risk to reoffend, with high or moderate needs in education, attitudes/behaviors, and aggression.

Several of the victim's family and friends submitted victim impact statements. Joanna Tilevi, the victim's sister; Karen Foerstner, the victim's girlfriend; and Michael Novic, Bobby Barker, and Mark Moore, the victim's friends, spoke at the sentencing hearing about the devastating impact of the victim's death on their lives. Ms. Tilevi noted that the victim lost his leg in another motorcycle accident involving an impaired driver. They requested that the trial court impose the maximum sentence.

Defendant made an allocution, in which he stated, "I apologize. I didn't mean for this to happen. I'm sorry for their loss. It was just an accident."

Relative to case number 117498, Defendant admitted to violating his probation by missing curfew, failing to report, and committing the offenses in this case, and he waived a probation violation hearing. The trial court found that Defendant had violated his probation.

The trial court stated that it had considered the trial record, the presentence report, the principles and purposes of sentencing, the arguments regarding alternative sentencing, the nature and characteristics of the conduct in this case, the mitigating and enhancement factors, and Defendant's allocution. The trial court noted, relative to the violation of probation. that Defendant was placed on probation on May 21, 2020, after he pleaded guilty to Class C felony vandalism, for which he was sentenced to six years as a Range I, standard offender. The trial court found that "there's not an appropriate program to place him in to address [his] issues," and ordered Defendant to serve the six-year sentence in confinement.

The trial court found relative to this case that Counts 1 and 4, DUI, merged into Count 9, DUI second offense.

Relative to Defendant's offender classification for the two felony convictions, the trial court found that Defendant was a Range II, multiple offender. The trial court applied enhancement factor (1), that Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish his range, noting that Defendant had seventeen prior convictions constituting "a very significant long criminal history" as well as illegal drug use. *See* Tenn. Code Ann. § 40-35-114(1). The court afforded this factor "a great deal of weight."

The trial court declined to apply enhancement factor (3), that the offenses involved more than one victim, the court noted that Count 3 named the victim and "others to the Grand Jurors unknown." The court noted that the trial testimony established,

there were multiple cars out there, who, even though those people were not injured, they still could be considered as a victim of the reckless endangerment, 'cause I certainly find that they were all in the zone of [D]efendant's danger that he created because of the way he was driving on that day. So I'm not going to use it as an enhancement factor; however, I do find that there are multiple victims in this case. I just find that they are named victim, even though it referred to [it] as others.

The trial court applied enhancement factor (8), that, before trial or sentencing, Defendant failed to comply with the conditions of a sentence involving release in the community, finding that Defendant had three prior probation revocations unrelated to his charges in this case. *See* Tenn. Code Ann. § 40-35-114(8). The court noted that the factor "weighs greater in determining whether nor not he should get a probationary sentence . . . than it does as an enhancement factor[.]"

The trial court applied enhancement factor (10), that Defendant had no hesitation about committing a crime when the risk to human life was high, only to Count 2, vehicular homicide by recklessness. *See* Tenn. Code Ann. § 40-35-114(10). The court also applied enhancement factor (13)(C), that Defendant committed a felony while he was on probation. *See* Tenn. Code Ann. § 40-35-114(13)(C).

The trial court stated that it had considered in mitigation that the STRONG-R assessment rated Defendant a moderate risk to reoffend, that Defendant was employed, that he did not flee after the accident, and that he cooperated with police. *See* Tenn. Code Ann. § 40-35-113(13). The trial court found that the enhancement factors "greatly, greatly outweigh any mitigation in this case" and that sentences near or at the top of the range were appropriate.

Relative to consecutive sentencing, the trial court found that Defendant had an extensive record of criminal activity, noting that his prior convictions included multiple felonies and a DUI.[1] *See* Tenn. Code Ann. § 40-35-115(b)(2). The trial court commented that the Defendant had been struggling with substance abuse for twenty years and that he should not have been driving a car. The court found that this factor "justifies some consideration for consecutive sentencing." The trial court also found that Defendant committed the offenses while he was on probation. *See* Tenn. Code Ann. § 40-35-115(b)(6).

The trial court also found that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in

---

[1] The record reflects that Defendant had two prior convictions for DUI; however the trial court only discussed one of the convictions at the sentencing hearing.

which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4). The trial court further found that the circumstances of the offenses were aggravated, noting that the jury could "easily" have convicted Defendant of vehicular homicide by intoxication and that "the fact that he had those drugs in his system aggravate this case beyond . . . normal reckless homicide." The court also found that confinement for an extended period of time was necessary to protect society from Defendant's unwillingness to lead a productive life and his resort to criminal activity in furtherance of an antisocial lifestyle. The court noted that, although Defendant was employed and had children, he also had "such a long criminal history" and multiple opportunities to get help while on probation.

The trial court considered whether the aggregate length of the sentence reasonably related to the offenses, commenting,

> And so the hardest part in this one is the reckless endangerment with a deadly weapon being consecutive to the vehicular homicide that resulted in the death of [the victim]. And that's – I'm going to go back to why I didn't consider the enhancement for you on multiple victims, because I do believe that these other folks are really the victims in [Count] 3. You've got [the victim] the victim in [Count] 2. And I know [Count] 3 names . . . [the] victim, but it also says, "others to the Grand Jurors unknown." So I think those folks are victims. So not only did [Defendant] put . . . [the victim] at risk of death, he also put these other folks at risk by driving around them in such a reckless way.

Relative to the manner of service, the trial court found that confinement was necessary to protect society by restraining a defendant with a long criminal history of criminal conduct, noting that this principle alone warranted confinement. *See* Tenn. Code Ann. § 40-35-103(1)(A). The court also found that confinement was necessary to avoid depreciating the seriousness of the offenses and that Defendant's behavior in consuming substances, driving recklessly, taking the victim's life, and endangering others on the road was "very wanton." *See* Tenn. Code Ann. § 40-35-103(1)(B). The court further found that measures less restrictive than confinement had frequently and recently been applied unsuccessfully to Defendant. *See* Tenn. Code Ann. § 40-35-103(1)(C). The trial court found that Defendant was not amenable to rehabilitation, as demonstrated by his record for "the last . . . 27 years[.]" The court concluded that "confinement is warranted, to the extent that split confinement would not be sufficient in this case."

The trial court announced the following sentences:

| Count | Offense | Sentence | |
|---|---|---|---|
| 1 | DUI | | Merged with Count 9 |
| 2 | Vehicular homicide by recklessness | 10 years | Consecutive to Count 9 |
| 3 | Reckless endangerment with a deadly weapon | 4 years | Consecutive to Count 9 |
| 4 | DUI | | Merged with Count 9 |
| 5 | Driving on a revoked license | 6 months | Concurrent with Count 2 |
| 6 | Failure to drive on the right side of the road | 30 days | Concurrent with Count 2 |
| 7 | Violation of financial responsibility law | 30 days | Concurrent with Count 2 |
| 9 | DUI second offense | 11 months, 29 days | Consecutive to Counts 2 and 3 |

The effective sentence was fourteen years at 35% service and eleven months, twenty-nine days at 100% service.[2]  The trial court also ordered that the sentences in this case be served consecutively to the six-year sentence in Case No. 117498.

Defendant filed a timely motion for new trial on April 21, 2022.  In relevant part, Defendant argued that "the trial court erred by ordering consecutive sentences in Counts 2, 3 and 9," without further discussion.  Defense counsel included in the motion for new trial a request to withdraw and for appellate counsel to be appointed.  The trial court appointed appellate counsel on April 22, 2022; no amended motion for new trial is present in the record.

At the April 14, 2023 motion for new trial hearing, appellate counsel argued an issue related to the sufficiency of the evidence and "rest[ed] on the brief for the remaining issues[.]"  Appellate counsel later stated, "There's also issues that have been raised in

_____

[2] The judgment forms reflect that the misdemeanor sentences in Counts 5, 6, and 7 had a 75% release eligibility; Count 9 had 100% service.

regards to the [c]ourt imposing consecutive sentencing on this case addressed on the briefs for that."

The trial court denied the motion and entered an order to that effect on April 17, 2023. On July 13, 2023, Defendant filed a notice of appeal in this court and a motion to waive its timely filing, which this court granted in the interest of justice.

## **Analysis**

On appeal, Defendant contends that the trial court erred by "imposing consecutive sentencing because reckless endangerment by use of a vehicle as a deadly weapon is a lesser[-]included offense of reckless vehicular homicide and merger of [Defendant's] sentences . . . is necessary to cure the double jeopardy violation resulting from multiple punishments for the same conduct." The State responds that Defendant has waived this issue for failure to include it in the motion for new trial and that he is not entitled to plain error relief. Defendant responds in his reply brief that his issue was, in fact, raised in the motion for new trial and that he is entitled to plenary review.

As a preliminary matter, we disagree with Defendant that his double jeopardy issue was raised in the motion for new trial. Tennessee Rule of Appellate Procedure 3(e) states that "in all cases tried by a jury, no issue presented for review shall be predicated upon . . . . [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."

"Raising an issue in a motion for new trial allows the trial court to consider or reconsider the issue and make an appropriate ruling." *State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018). A motion for new trial "should identify the specific circumstances giving rise to the alleged error so that it may be reasonably identified in the context of the entire trial." *Fahey v. Eldridge*, 46 S.W.3d 138, 143 (Tenn. 2001). "The contents of the motion [for new trial] should direct the attention of the trial court and prevailing party to the asserted error, and the movant should specify the issues with sufficient certainty to enable the appellate court to determine whether the issue was first raised in the trial court." *Harbison*, 539 S.W.3d at 164 (citing *Waters v. Coker*, 229 S.W.3d 682, 689 (Tenn. 2007)). However, "precise citation to a rule, statute, or case as the legal ground for the alleged error is normally not required to preserve the issue for appeal under [Tennessee] Rule [of Appellate Procedure] 3(e)[.]" *Fahey*, 46 S.W.3d at 143.

Defendant correctly observes that, generally, broad statements of an issue in the motion for new trial can be sufficient to preserve the issue for appeal. However, if we concluded that Defendant's statement in the motion for new trial fairly raised a double jeopardy issue, Rule 3(e)'s requirements would cease to have meaning. Even when viewed

in the light most favorable to Defendant, the motion for new trial identified the circumstances giving rise to the alleged error as the trial court's imposing consecutive sentences in Counts 2, 3, and 9, which does not implicate double jeopardy.

Double jeopardy protects defendants from being punished twice for the same offense. In the event that dual convictions are improper, the relief required is for the trial court to merge the convictions, not to impose concurrent sentencing. *See State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015) (stating that "merger is required when a jury returns verdicts of guilt on two offenses and one of the guilty verdicts is a lesser-included offense of the other offense"); *see also Jones v. State*, No. W2019-01182-CCA-R3-PC, 2020 WL 7040978, at *3 (Tenn. Crim. App. Nov. 30, 2020) (noting that concurrent sentencing did not cure a double jeopardy violation because "if two convictions must be merged, there will be only one conviction. Concurrent sentencing for two convictions that should properly be merged results in two convictions, one of which should not exist"). Although Defendant's statement of the issue on appeal references merger, his motion for new trial did not.[3]

Accordingly, an issue stating, "[T]he trial court erred by ordering consecutive sentences in Counts 2, 3 and 9," does not fairly raise whether the convictions violate double jeopardy.

We note that appellate counsel had the opportunity to amend the motion for new trial or verbally amend the motion for new trial at the hearing by arguing a double jeopardy issue. *See* Tenn. R. App. P. 36(a). As a result, Defendant has waived plenary review of this issue. In addition, the State explicitly raised waiver in its brief and at oral argument, and Defendant declined to request plain error review. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007). As a result, we conclude that this issue has been waived, and Defendant is not entitled to relief on this basis.

### Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[3] Defendant's argument is further undermined by the inclusion of Count 9 in the issue as stated in the motion for new trial—DUI second offense is clearly not a lesser-included offense of vehicular homicide by recklessness or reckless endangerment, and Defendant does not include Count 9 in his issue on appeal.