FILED

10/30/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2024

## STATE OF TENNESSEE v. MARQUIS RASHUM McREYNOLDS

**Appeal from the Criminal Court for Roane County**
**No. 2021-CR-165A          Jeffery Hill Wicks, Judge**
———————————————————

**No. E2023-01728-CCA-R3-CD**
———————————————————

The Defendant, Marquis Rashum McReynolds, was convicted by a Roane County Criminal Court jury of aggravated assault with a deadly weapon, a Class C felony; aggravated robbery, a Class B felony; especially aggravated robbery, a Class A felony; reckless endangerment with a deadly weapon, a Class E felony; and employing a firearm during the commission of a dangerous felony, a Class D felony. *See* T.C.A. §§ 39-13-102(a)(1)(A)(iii) (Supp. 2020) (subsequently amended) (aggravated assault); 39-13-402 (2018) (aggravated robbery); 39-13-403 (2018) (especially aggravated robbery); 39-13-103 (2018) (subsequently amended) (reckless endangerment); 39-17-1324(b) (2018) (subsequently amended) (employing a firearm during the commission of a dangerous felony). The trial court dismissed the firearm charge and imposed an effective sentence of twenty-five years. On appeal, the Defendant contends that the trial court erred in (1) denying his request to admit the video recording of the victims' interviews with police; (2) denying his request to sever his trial from his codefendant's trial; and (3) failing to grant a new trial based upon newly discovered evidence presented at the sentencing hearing. We affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which KYLE A. HIXSON J., joined. JAMES CURWOOD WITT, JR., J., not participating.[1]

Matt Courteau, Kingston, Tennessee, for the appellant, Marquis Rashum McReynolds.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Russell Johnson, District Attorney General; and Jason S. Collver and Jonathan Edwards, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] The Honorable J. Curwood Witt, Jr. died on August 17, 2024, during the pendency of this appeal. We acknowledge his twenty-seven years of faithful service to this court.

**OPINION**

The Defendant's convictions stem from the November 17, 2020 robbery of the victims, Richard Christian and Kaitlyn Myers, by the Defendant and codefendant Michael Lory Douglas, during which the codefendant shot Mr. Christian. The Defendant and the codefendant were charged with aggravated kidnapping, two counts of aggravated assault, aggravated robbery, especially aggravated robbery, two counts of especially aggravated kidnapping, and employing a firearm during the commission of a dangerous felony.

At the trial, Mr. Christian testified that on November 17, 2020, Ms. Myers, whom he had met at a party during the previous week, came to his home where they planned to "hang[] out" and watch movies. Mr. Christian stated that he operated a barbershop out of his home and that the codefendant, who was his cousin, called him requesting a haircut. The codefendant arrived at Mr. Christian's home at approximately 8:45 or 9:00 p.m. accompanied by the Defendant. Mr. Christian said that the codefendant brought "some type of bag" with him and that he gave the codefendant a haircut while Ms. Myers was in Mr. Christian's bedroom.

Mr. Christian testified that after the haircut, Mr. Christian and the codefendant returned to the living room where the Defendant showed him YouTube videos of his rapping. Mr. Christian stated that while watching the videos, he heard the codefendant ask, "[W]here the money, where the drugs, where the money, where the drugs?" Mr. Christian turned and saw the codefendant pointing a gun at him. Mr. Christian stated that the codefendant ordered him to stand and pushed him toward the barbershop area. The codefendant instructed the Defendant to "go get the b---- out of the room," after which Mr. Christian saw Ms. Myers walking out of the bedroom. Mr. Christian stated that the codefendant fired two shots, one of which struck him in his left leg above the knee. The bullet then entered his right leg, fracturing his femur. Mr. Christian said that at the time of trial, the bullet remained in his right leg.

Mr. Christian testified that as he and Ms. Myers lay on their stomachs, the codefendant patted them down and searched for money, drugs, and firearms but did not find any. Mr. Christian stated that the codefendant instructed the Defendant to search the rooms and that the Defendant ransacked the bedroom while the codefendant held Mr. Christian at gunpoint. The Defendant came out of the bedroom with various items, including belts, jewelry, and sunglasses. Mr. Christian said that the codefendant gave the gun to the Defendant, went outside, and attempted to steal Mr. Christian's car. Mr. Christian heard his car engine "revving up," but the codefendant was unable to drive the car due to a mechanical issue. The Defendant stood in the doorway and instructed Mr.

- 2 -

Christian and Ms. Myers not to move from their positions on the floor. Mr. Christian stated that the codefendant reentered the home and that the codefendant and the Defendant gathered Mr. Christian's jewelry, sunglasses, belts, and cell phone and Ms. Myers's car keys and identification. Mr. Christian said that before leaving, "they" told him not to call the police.

Mr. Christian testified that after the Defendant and the codefendant left, Ms. Myers locked the door, used a rope as a tourniquet around Mr. Christian's leg, and drove him to a hospital. Mr. Christian said that he was in the worst pain in which he had ever been and that he feared he would die. After receiving treatment at the hospital, he had to use crutches and undergo physical therapy. He said that at the time of the trial, he continued to experience numbness and pain in his legs.

During cross-examination, Mr. Christian testified he and the codefendant were not involved in any disputes prior to the robbery and shooting, and Mr. Christian did not know why the codefendant shot him. Mr. Christian stated that the codefendant shot him before the codefendant told him to lie on the floor, that the first shot occurred while the Defendant and Ms. Myers were exiting the bedroom, that the second shot occurred ten to twelve seconds later, and that the codefendant's gun was the only firearm that Mr. Christian saw that night. Mr. Christian said Ms. Myers told him that the Defendant pulled her off the bed and that she injured her "tailbone." Mr. Christian said he was unable to see everything that occurred while he lay on the floor. He stated that the items taken by the Defendant and the codefendant included a custom piece of jewelry valued at approximately $12,000, an MCM belt valued at approximately $400, and a pair of Gucci sunglasses valued at approximately $300.

Mr. Christian testified that officers attempted to question him at the hospital while he was medicated with morphine and that he did not know what he was saying. He acknowledged that while medicated, he may have told the officers that he was walking into his home when an unknown person shot him with a handgun. He said that officers interviewed him at his mother's home the following day and that the officers separated him and Ms. Myers before interviewing them. He said he did not review any written statement provided by Ms. Myers.

Mr. Christian testified that the Defendant pointed a gun at him while the codefendant was outside attempting to steal Mr. Christian's car, but Mr. Christian could not recall whether he provided this information to officers. Mr. Christian explained that he told officers that "they" attempted to steal his car even though only the codefendant went outside because the codefendant and the Defendant were "together at that crime." Mr. Christian read his written statement to the jury, and his written statement reflected Mr. Christian's testimony.

Mr. Christian testified that the codefendant was using methamphetamine and heroin on the evening of the offenses and that Mr. Christian "may" have smoked CBD that night. Mr. Christian said he did not see the Defendant taking any drugs. Mr. Christian stated he learned officers discovered a significant amount of methamphetamine inside his home during their investigation and that he was unaware that officers also found marijuana and drug paraphernalia.

On redirect examination, Mr. Christian testified that the codefendant retrieved the drugs from a black bag. Mr. Christian also testified that he was still under the effects of medication when he provided a written statement to police.

Kaitlyn Myers testified that she met Mr. Christian at a party on November 13, 2021, and that she went to his home four days later to spend time with him. Ms. Myers stated that while she and Mr. Christian were talking in the living room, she heard someone knocking on the door and that Mr. Christian opened the door and allowed two men to enter. She acknowledged that she was frustrated with Mr. Christian's "trying to let people interrupt our time." She said that one of the men showed rap videos to Mr. Christian but that she looked at her cell phone and did not pay attention. Ms. Myers said she went into Mr. Christian's bedroom to charge her cell phone while Mr. Christian cut one of the men's hair.

Ms. Myers testified that she believed she heard a "commotion" and recalled "somebody walking in the room, like barging in, and dragging me off the bed, or trying to drag me off the bed." She did not recall whether the man said anything to her. She said she was "terrified," attempted to fight back, and fell on her "tailbone." She stated that the man led her from the bedroom into the barbershop room where she saw the other man shoot Mr. Christian in his leg. She said that although she heard only one shot, she saw a hole in the floor and believed two shots were fired and that the men instructed Ms. Myers and Mr. Christian to lay face down on the floor, and they complied. Ms. Myers stated that the men yelled at them and asked them where the drugs were and that she was "just trying to hurry the situation along so [she] could help [Mr. Christian]."

Ms. Myers identified the Defendant and the codefendant at the trial as the two men who were at Mr. Christian's home, but she was unable to identify which was the Defendant and which was the codefendant. Ms. Myers testified that the codefendant pointed a gun at her and Mr. Christian and demanded drugs while the Defendant searched the bedroom. She stated she was "terrified" and did not know the extent of Mr. Christian's injuries. She said when the Defendant returned to the barbershop room, the codefendant gave the gun to the Defendant, and the codefendant took the keys to Mr. Christian's car, left the house, and started Mr. Christian's car while the Defendant pointed the gun at Ms. Myers and Mr. Christian. Ms. Myers stated that the Defendant did not say anything to her while he was

pointing the gun and that once the codefendant reentered the house, he and the Defendant gathered Mr. Christian's cell phone, a belt, a pair of sunglasses, and Ms. Myers's car keys and left. Ms. Myers said she did not give the codefendant and the Defendant permission to take her car keys.

Ms. Myers testified that after the Defendant and the codefendant left, she locked the door and applied a tourniquet to Mr. Christian's legs. She said she retrieved a cartridge casing and a hat, but she could not explain her reason for doing so. She drove Mr. Christian to a hospital.

On cross-examination, Ms. Myers testified that she believed only the codefendant yelled about drugs, but she acknowledged that she was not certain who yelled. She stated that the Defendant took her from the bedroom, that her tailbone was fractured, and that the Defendant was in the barbershop room when he was shot. She said she saw only one firearm during the incident. She stated that the Defendant, not the codefendant, searched the house and that Mr. Christian's bedroom was "turned upside down and destroyed." She later learned that the police discovered methamphetamine during a search of Mr. Christian's home, but she did not see anyone using drugs on the night of the offenses.

Ms. Myers testified that officers interviewed her the next day and that she provided a written statement. She affirmed that in her statement, she said the codefendant's "friend" entered the bedroom and attempted to drag her off the bed. She did not recall telling officers that she heard a gunshot while in the bedroom or that her tailbone was bruised from sitting for so long at the hospital. She did not recall testifying at the preliminary hearing that she did not hear anything while in the bedroom other than someone saying, "get that b----." She explained, "I recall the statement being made, but I don't recall not hearing the gun shots."

Kent Warren, a retired detective with the Harriman Police Department, testified that he went to the scene and later obtained a search warrant for Mr. Christian's house. He located a small bag containing what was later identified as marijuana in the parking area outside of the house and several blood spatter stains leading from the front door. He observed what appeared to be blood leading from the far end of the living room to the front door and a small pool of blood at the front door. The bedroom appeared to have been ransacked. Mr. Warren stated that the barbershop room did not appear in disarray but that a large amount of blood was on the floor. He recovered a .40-caliber cartridge casing in a knit cap on a television stand in the living room, but he did not locate any other firearms or ammunition inside the house. Drug paraphernalia and a black satchel containing what Mr. Warren believed to be methamphetamine were on the kitchen island, and an identification card belonging to the codefendant was on a coffee table in the living room.

Mr. Warren subsequently determined that before the incident, Mr. Christian received a call from a cell phone number belonging to the codefendant's mother.

On cross-examination, Mr. Warren read his report summarizing his November 18, 2020 interview with Ms. Myers. According to the report, Ms. Myers stated that "Mikey" and another man came to Mr. Christian's house and that Mikey asked Mr. Christian for a haircut. Ms. Myers went into Mr. Christian's bedroom to use her cell phone while Mr. Christian cut Mikey's hair. She stated that while in the bedroom, she heard a gunshot and that the other man entered the bedroom, grabbed her, and forced her into the barbershop room. She said that the men demanded money and drugs and that Mr. Christian told them that he had neither. Mr. Christian lay on the floor of the barbershop room while Mikey held a black gun. Ms. Myers stated that she was forced onto the floor and that Mikey shot Mr. Christian, striking his legs. She said that the second man held them at gunpoint while Mikey searched the bedroom and went outside to Mr. Christian's car and that the men attempted to steal Mr. Christian's car. Ms. Myers stated that the two men took Mr. Christian's cell phone and her car keys and fled in a white car.

Mr. Warren testified that officers recovered drug paraphernalia in the living room. Testing revealed that the substance in the black satchel was approximately six grams of methamphetamine. He explained that Mr. Christian was not charged with possession of methamphetamine because officers were unable to determine to whom the drugs belonged. On redirect examination, Mr. Warren testified that based upon statements made to him, he concluded that the black satchel belonged to the codefendant.

The Defendant called Harriman Police Detective Richard Wood, who testified that he interviewed Mr. Christian and Ms. Myers at the hospital. Detective Wood read his report summarizing the interviews into evidence. It reflected that Mr. Christian was shot with a handgun at his residence and that Ms. Myers transported him to the hospital. Detective Wood observed that the bullet appeared to have entered Mr. Christian's left thigh, exited, and entered his right thigh, where the bullet remained. Detective Wood noted that the interview was limited due to Mr. Christian's medicated state and need for continued medical treatment.

According to Detective Wood's report, Ms. Myers stated that while she was in the bedroom on her cell phone, she heard what she believed to be a gunshot. She said two men entered the bedroom and dragged her out of the bedroom and toward the living room. She stated that although she attempted to fight back, the men placed her at gunpoint on the floor near the living room, took various items, and fled the residence.

Harriman Police Detective Brian Turner testified that he interviewed Mr. Christian and Ms. Myers the following day at the home of Mr. Christian's mother. Detective Turner

stated that the interviews were recorded and that he obtained a written statement from each of them. He noted that Mr. Christian was still in discomfort and pain and said he did not obtain many details of the events from him as a result. Detective Turner said that Mr. Christian and Ms. Myers were in the same room during the interviews but that Detective Turner did not believe they read each other's written statements before giving them. Detective Turner agreed neither Mr. Christian nor Ms. Myers told him that the Defendant held them at gunpoint.

Detective Turner read his report summarizing his interviews with Mr. Christian and Ms. Myers into evidence. According to the report, Mr. Christian stated that he and Ms. Myers were at the home when his cousin, the codefendant, called him requesting a haircut. Mr. Christian said the codefendant arrived with a man Mr. Christian did not know. The man showed Mr. Christian videos of his rapping while Ms. Myers was in Mr. Christian's bedroom. Mr. Christian stated that the codefendant produced either a 9-millimeter or .40-caliber handgun and demanded drugs and money and that Mr. Christian told him that he did not have any drugs or money. Mr. Christian said the codefendant shot twice, striking Mr. Christian's left leg and possibly his right leg. The codefendant forced Mr. Christian and Ms. Myers to lie face down on the floor in the barbershop room while the codefendant and the other man searched the house. The two men left, taking Mr. Christian's cell phone, a belt, sunglasses, jewelry, and Ms. Myers' car keys. Ms. Myers drove Mr. Christian to the hospital.

According to Detective Turner's report, Ms. Myers stated that while she was at Mr. Christian's home, the codefendant and an unknown man arrived and that Mr. Christian began cutting the codefendant's hair while she went into a bedroom to charge her cell phone. She said that she was in the bedroom for approximately fifteen minutes when the second man entered the bedroom and attempted to drag her off the bed. She said she attempted to defend herself but was forced into the barbershop room and made to lie down. She stated that Mr. Christian was then shot in his legs and that she and Mr. Christian remained on the floor for approximately thirty minutes while the codefendant and the other man searched for money and drugs. She stated that the codefendant left the house and attempted to steal Mr. Christian's car and that after the codefendant returned to the house, he and the other man took her car keys and left.

Upon this evidence, the jury acquitted the Defendant and the codefendant of the kidnapping charges. The jury found the Defendant and the codefendant guilty of aggravated assault of Ms. Myers with a deadly weapon, aggravated robbery of Ms. Myers, especially aggravated robbery of Mr. Christian, and employing a firearm during the commission of a dangerous felony. The jury convicted the codefendant of aggravated assault of Mr. Christian resulting in serious bodily injury as charged in the indictment and convicted the Defendant of reckless endangerment with a deadly weapon as a lesser

included offense of aggravated assault. The trial court subsequently dismissed the firearm convictions due to the jury's acquittal of the especially aggravated kidnapping charge, which was the underlying felony upon which the firearm convictions were based.

During the sentencing hearing, the codefendant testified that he shot Mr. Christian only after Mr. Christian "pulled a gun" on him. The codefendant stated that he did not steal anything from either victim, that both victims lied at the trial, and that the Defendant "had nothing to do with what [the codefendant] had going on with [Mr. Christian]." The trial court ordered the Defendant to serve an effective twenty-five-year sentence and the codefendant to serve an effective thirty-year sentence. This appeal followed.

## I. Exclusion of the Video Recording of the Victims' Interviews with Police

The Defendant contends that the trial court erred in excluding the video recording of the victims' interviews with police. Citing to Tennessee Rules of Evidence 613 and 803(26), the Defendant maintains that during the interviews, both victims made statements that were inconsistent with their testimony at the trial and that the recording should have been admitted "to impeach the victims' credibility." The State responds that the Defendant waived this issue by failing to include the video recording in the appellate record and that the record otherwise supports the trial court's decision.

Before the testimony at the trial, the Defendant announced his intention to call the police officers who interviewed the victims as witnesses to question the officers regarding any statements made by the victims that were inconsistent with their testimony at trial. The State objected. The trial court ruled that before presenting extrinsic evidence of any prior inconsistent statements by the victims, the Defendant must first question the victims about their prior inconsistent statements to provide the victims with the opportunity to admit or deny making the statements.

During the cross-examination of Mr. Christian, the Defendant requested permission to play the video recording of the officer's interview of Mr. Christian and argued that the recording was admissible as both impeachment evidence and as substantive evidence. The trial court held a hearing outside the jury's presence and subsequently reviewed the recording. The court noted that the recording included statements regarding the codefendant's prior criminal history and criminal conduct, and the codefendant objected to the admission of the statements. The court ordered the Defendant to redact these statements from the recording. The court told the Defendant "you can question [Mr. Christian] about what he said to the officer and ask him if he admits it or denies it. You can ask the officer the same things, and if you have the video redacted, you can play the portions you want."

- 8 -

Defense counsel questioned the victims on cross-examination regarding their statements to various police officers, and they were unable to recall much of what they had told the officers. As part of his defense, the Defendant called Detective Turner to testify regarding his video-recorded interviews with the victims, but the Defendant did not seek to admit any portion of the recording. Rather, based on an agreement with the State, Detective Turner read his report, in which he summarized the statements made by each victim during their interviews.

The trial court did not exclude the video recording in its entirety. Rather, the court ordered the Defendant to redact the statements referencing the codefendant's criminal history and granted the Defendant the opportunity to impeach the victims with any prior inconsistent statements in their recorded interviews by questioning the victims about their prior statements and then playing the corresponding portions of the recording if a victim denied or equivocated about the statement. The Defendant chose not to take advantage of the trial court's ruling.

To the extent that the Defendant claims that the trial court erred in denying his request to present the video recording in its entirety, we note that the Defendant failed to include the recording in the appellate record. The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See* T.R.A.P. 24(a), (b); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, in the absence of a fair, accurate, and complete record, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citations omitted); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). Accordingly, the Defendant is not entitled to relief on this basis.

## II. Denial of Severance

The Defendant challenges the trial court's denial of his motion to sever his and his codefendant's cases for trial. He asserts that because the court denied his motion to sever, he was unable to call the codefendant as a witness to present exculpatory evidence regarding the Defendant's lack of participation in the offenses and that he was unable to present the entire video recording of the victims' interviews with police. The Defendant maintains that severance was necessary to promote a fair determination of his guilt or innocence. The State responds that the trial court did not abuse its discretion in denying the Defendant's motion.

The Defendant filed a pretrial motion to sever his case for trial from that of his codefendant pursuant to Tennessee Rule of Criminal Procedure 14(c)(2). The Defendant maintained that the codefendant made statements indicating that the Defendant was not guilty of the offenses. The Defendant argued that, at a joint trial, the codefendant could assert his Fifth Amendment right against self-incrimination and decline to testify but that if the Defendant were tried after the codefendant's trial, the codefendant could testify at the Defendant's trial without fear of incriminating himself. The State responded that the Defendant failed to provide a sufficient basis for severance. Relying upon *State v. Price*, the State argued that a trial court does not err in denying a severance based on a claim that a codefendant would provide exculpatory testimony at a separate trial where the codefendant invoked his Fifth Amendment rights and declined to testify at a joint trial. *See State v. Price*, 46 S.W.3d 785, 805 (Tenn. Crim. App. 2000). The State also noted that it might elect to try the Defendant before the codefendant if the cases were severed.

During a pretrial hearing, the Defendant argued that severance of the trials was necessary for a fair determination of his guilt or innocence because the codefendant would testify during the Defendant's trial that the Defendant was merely present and did not actively participate in the offenses. The Defendant sought to call the codefendant as a witness during the hearing, but codefendant's counsel opposed the request. The codefendant's counsel stated that she notified both the Defendant's counsel and the State that

> my client has been very adamant . . . from the inception of the case saying that [the Defendant] had nothing to do with this situation that has been litigated here. Should he decide to testify at our trial, he would confirm that information, if the Judge decides to sever the two defendants, that would not change his statement that he had given before.

The codefendant's counsel stated that her client had not yet decided whether he would testify at his own trial and that as a result, she was unwilling to expose the codefendant to cross-examination by the State during the pretrial hearing. The codefendant's counsel also stated that she was in the process of obtaining records and requested that the Defendant be tried first if the trials were severed.

The State noted that both victims testified at the preliminary hearing and identified the Defendant and the codefendant as committing the acts charged in the indictment. The State also noted that the Defendant did not rely on the codefendant's police statement but on "information and belief." The State asserted that "according to the statement [the codefendant] gives, it doesn't come out and sta[te] exculpatory evidence toward [the Defendant]" and that the Defendant did not rely on any evidence provided in discovery to support his claim that the codefendant would exonerate him. The State urged the trial court

to deny the motion to sever and "proceed under the victims['] testimony and criminal responsibility as alleged."  At the conclusion of the hearing, the court concluded that "[b]ased upon what I've heard and the case law, I'm going to deny the Motion for Severance."

"Joint trials play a vital role in the criminal justice system" because they promote judicial efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  *Richardson v. Marsh*, 481 U.S. 200, 209 (1987); *see Zafiro v. United States*, 506 U.S. 534, 537 (1993); *State v. Harbison*, 539 S.W.3d 149, 158 (Tenn. 2018).  Pursuant to Tennessee Rule of Criminal Procedure 8(c), an indictment may charge multiple defendants:

> (1) if each of the defendants is charged with accountability for each offense included;
>
> (2) if each of the defendants is charged with conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy; or
>
> (3) even if conspiracy is not charged and all of the defendants are not charged in each count, if the several offenses charged:
>
> (A) were part of a common scheme or plan; or
>
> (B) were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

A defendant may seek a severance from his codefendants pursuant to Tennessee Rule of Criminal Procedure 14(c)(2).  The Rule requires a trial court to grant a request for severance if severance is found to be "appropriate to promote a fair determination of guilt or innocence of one or more defendants."  *See* Tenn. R. Crim. P. 14(c)(2).[2]  Our supreme court has explained:

> There is no bright-line rule as to when a trial court should grant a defendant's request for severance.  Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance:  the number of defendants named in the indictment, the number of counts charged in the

---

[2] Although not raised in this appeal, a defendant may also "move[ ] for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant. . . ."  Tenn. R. Crim. P. 14(c)(1).

indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a codefendant(s) which is inadmissible or excluded as to another defendant.

*Harbison*, 539 S.W.3d at 159 (citing *United States v. Gallo*, 668 F.Supp. 736, 749 (E.D.N.Y. 1987)).

When multiple defendants are charged in the same indictment, "evidence that is not necessarily applicable to another defendant may be admissible against one or more defendants," and "[a] defendant is not entitled to a separate trial merely because damaging proof is introduced against another defendant." *Id.* (citing *State v. Meeks*, 867 S.W. 361, 369 (Tenn. Crim. App. 1993); *Black v. State*, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990)). Furthermore, "[m]utually antagonistic defenses among co-defendants may be the basis for granting a severance in some circumstances but are not per se prejudicial." *Id.* at 161 (citing *Zafiro*, 506 U.S. at 538). This court has recognized that "[m]ere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic" and that "[t]he defendant must go further and establish that a joint trial will result in compelling prejudice, against which the trial court cannot protect, so that a fair trial cannot be had." *State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996) (citations omitted).

This court reviews a trial court's denial of a motion to sever trials for abuse of discretion. *Harbison*, 539 S.W.3d at 159. A trial court abuses its discretion by applying an incorrect legal standard or reaching a decision against logic or reasoning that causes an injustice to the complaining party. *See id*. "We do not interfere with the trial court's exercise of its discretion unless the denial of the motion for severance results in clear prejudice to the defendant." *Id*. (citing *State v. Carruthers*, 35 S.W.3d 516, 552 (Tenn. 2000)). "Reversal is required only when the defendant establishes that he was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." *Id.* at 159-60 (citations and internal quotations marks omitted).

The Defendant asserts that the trial court did not afford him the opportunity to establish the grounds for severance because the court did not permit him to call the codefendant as a witness during the pretrial hearing. The Defendant, however, does not cite to authority permitting him to call the codefendant as a witness at a pretrial hearing, over the objection of the codefendant's counsel, to testify to the circumstances of the offenses with which they were both charged. We observe that the codefendant in such a

scenario must be afforded his Fifth Amendment privilege against self-incrimination, notwithstanding the Defendant's desire to compel the codefendant's testimony. Regardless, during the hearing, codefendant's counsel informed the trial court that the codefendant maintained that the Defendant was not involved in the commission of the offenses.

The Defendant submits that the trial court failed to make sufficient findings to support the denial of his motion to sever. We agree. Other than saying "based upon what I've heard and the case law," the court failed to make findings supporting its denial of the Defendant's motion. However, based on the record, we conclude that the Defendant has not shown that the trial court abused its discretion in denying a severance.

Although the Defendant sought severance on the basis that the codefendant would provide exculpatory testimony at the Defendant's separate trial, the codefendant invoked his Fifth Amendment privilege against self-incrimination and declined to testify during the joint trial. This court has held that "'[i]t is not an abuse of the trial court's discretion to refuse to sever when the defendant claims that a codefendant would have given exculpatory testimony at a separate trial but the codefendant invoked the [F]ifth [A]mendment at a joint trial.'" *Price*, 46 S.W.3d at 805 (quoting *State v. Ash*, 729 S.W.2d 275, 279 (Tenn. Crim. App. 1986)); *see State v. Octavius Flynn and Derrick Benson*, No. W2015-01648-CCA-R3-CD, 2017 WL 1861784, at *17 (Tenn. Crim. App. May 5, 2017), *perm. app. denied* (Tenn. Sept. 22, 2017). The Defendant also submits that the entire video recording of the victims' interviews with police would have been admitted in his trial had his trial been severed from the codefendant's trial. However, we are precluded from considering this issue due the recording's absence from the appellate record. *See Miller*, 737 S.W.2d at 558: Tenn. R. App. P. 24(a), (b).

Consideration of the *Harbison* factors also supports the trial court's decision to deny severance. The indictment charged the Defendant and the codefendant with multiple charges resulting from the robbery of the victims during which the codefendant shot Mr. Christian. The State relied upon the testimony of the victims and sought to convict the Defendant based on his direct participation in the offenses and on a theory of criminal responsibility for the codefendant's conduct. Most, if not all, of the evidence presented during the joint trial would have been admissible against the Defendant if his case had been severed from the codefendant's case for trial. *See State v. Glenn Roby, Jr. and Kevyn Deshawn Allen*, No. M2020-00301-CCA-R3-CD, 2022 WL 1617233, at *14 (Tenn. Crim. App. May 23, 2022) (upholding the denial of severance in a first degree murder case when the State pursued a theory of criminal responsibility and, thus, much of the same evidence would have been admissible against the defendant if his trial had been severed from his codefendant's trial), *perm. app. denied* (Tenn. Oct. 19, 2022). The record reflects that the

- 13 -

defenses of the Defendant and the codefendant centered on attacking the credibility of the victims.

The Defendant asserts that severance was necessary due to the disparity of evidence between his participation and the codefendant's participation in the offenses. "Severance is not required due to the mere fact that there may be more damaging proof against one defendant, as opposed to the other." *Octavius Flynn*, 2017 WL 1861784, at *18; *see State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993); *State v. Rosalind Marie Johnson and Donna Yvette McCoy*, No. E1999-02468-CCA-R3-CD, 2000 WL 1278158, at *4 (Tenn. Crim. App. Sept. 11, 2000). The jury's decision to convict the Defendant of reckless endangerment with a deadly weapon as a lesser included offense of aggravated assault of Mr. Christian showed that the jury considered and distinguished the evidence presented against the Defendant and the codefendant regarding their respective participation in the offenses. *See Harbison*, 539 S.W.3d at 164.

Because the Defendant failed to establish that the trial court's denial of his motion to sever the trials resulted in clear prejudice, the court did not abuse its discretion in denying the Defendant's motion.

### III. Newly Discovered Evidence

Finally, the Defendant asserts that the codefendant's testimony during the sentencing hearing that he shot Mr. Christian in self-defense after Mr. Christian pointed a gun at the codefendant constitutes newly discovered evidence that warrants a new trial. The State responds that the Defendant failed to establish that he is entitled to relief. We agree with the State.

A defendant who seeks relief in a motion for new trial based on newly discovered evidence must establish: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." *State v. Caldwell*, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing *State v. Goswick*, 656 S.W.2d 355, 358-60 (Tenn. 1983)). "In order to show reasonable diligence, the defendant must demonstrate that neither he nor his counsel had knowledge of the alleged newly discovered evidence prior to trial." *State v. Meade*, 942 S.W.2d 561, 566 (Tenn. Crim. App. 1996) (citing *Jones v. State*, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970)). The determination of whether to grant or deny a motion for new trial based on newly discovered evidence rests within the trial court's discretion. *State v. Walker*, 910 S.W.2d 381, 395 (Tenn. 1995).

The trial court did not make any findings in denying the Defendant's motion for new trial based on his claim of newly discovered evidence. Nevertheless, the Defendant

has failed to establish that the codefendant's claim that he shot Mr. Christian after Mr. Christian first pointed a gun at him constitutes newly discovered evidence. The Defendant was present when the offenses occurred, and he has not shown why, in the exercise of reasonable diligence, he could not have discovered this evidence sooner. Accordingly, the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

 

_____

ROBERT H. MONTGOMERY, JR., JUDGE